# CALIFANO, SECRETARY OF HEALTH, EDUCATION, AND WELFARE *v.* GOLDFARB

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

No. 75–699.   Argued October 5, 1976—Decided March 2, 1977

.BRENNAN, J., announced the Court's judgment and delivered an opinion, in which WHITE, MARSHALL, and POWELL, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 217. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and STEWART and BLACKMUN, JJ., joined, *post*, p. 224.

*Deputy Solicitor General Jones* argued the cause for appellant. With him on the brief were *Solicitor General Bork, Assistant Attorney General Lee, Howard E. Shapiro*, and *William Kanter*.

*Ruth Bader Ginsburg* argued the cause for appellee. With her on the brief were *Melvin L. Wulf* and *Nadine Taub*.

MR. JUSTICE BRENNAN announced the judgment of the Court and delivered an opinion in which MR. JUSTICE WHITE, MR. JUSTICE MARSHALL, and MR. JUSTICE POWELL joined.

Under the Federal Old-Age, Survivors, and Disability Insurance Benefits (OASDI) program, 42 U. S. C. §§ 401–431 (1970 ed. and Supp. V), survivors' benefits based on the earnings of a deceased husband covered by the Act are payable to his widow. Such benefits on the basis of the earnings of a deceased wife covered by the Act are payable to the widower, however, only if he "was receiving at least one-half of his support" from his deceased wife.[1] The question in this case is

---

[1] Title 42 U. S. C. § 402 (f) (1) (1970 ed. and Supp. V), in pertinent part, provides:

"The widower . . . of an individual who died a fully insured individual, if such widower—

"(A) has not remarried,

.        .        .        .        .

"(B) (i) has attained age 60, or (ii) has attained age 50 . . . and is under a disability . . . ,

"(C) has filed application for widower's insurance benefits . . . ,

"(D) (i) was receiving at least one-half of his support . . . from such individual at the time of her death, or if such individual had a period of disability which did not end prior to the month in which she died, at the time such period began or at the time of her death, and filed proof of such support within two years after the date of such death . . . , or (ii) was receiving at least one-half of his support . . . from such individual at the time she became entitled to old-age . . . insurance benefits . . . , and filed proof of such support within two years after the month in which she became entitled to such benefits . . . and,

"(E) is not entitled to old-age insurance benefits or is entitled to old-age insurance benefits each of which is less than the primary insurance amount of his deceased wife,

"shall be entitled to a widower's insurance benefit . . . ."

Compare 42 U. S. C. § 402 (e) (1) (1970 ed. and Supp. V), which provides, in pertinent part:

"The widow . . . of an individual who died a fully insured individual, if such widow . . .

"(A) is not married,

whether this gender-based distinction violates the Due Process Clause of the Fifth Amendment.

A three-judge District Court for the Eastern District of New York held that the different treatment of men and women mandated by § 402 (f)(1)(D) constituted invidious discrimination against female wage earners by affording them less protection for their surviving spouses than is provided to male employees, 396 F. Supp. 308 (1975).[2]  We noted probable jurisdiction.  424 U. S. 906 (1976).  We affirm.

## I

Mrs. Hannah Goldfarb worked as a secretary in the New York City public school system for almost 25 years until

---

"(B)(i) has attained age 60, or (ii) has attained age 50 . . . and is under a disability . . . ,

"(C)(i) has filed application for widow's insurance benefits . . . and

"(D) is not entitled to old-age insurance benefits or is entitled to old-age insurance benefits each of which is less than the primary insurance amount of such deceased individual,

"shall be entitled to a widow's insurance benefit . . . ."

[2] The decision also applied to § 402 (c)(1)(C), which imposes a dependency requirement on husbands of covered female wage earners applying for old-age benefits; wives applying for such benefits are not required to prove dependency, § 402 (b).  These gender-based classifications have been uniformly held to be unconstitutional.  See *Abbott* v. *Weinberger*, Civ. No. C74–194 (ND Ohio, Feb. 12, 1976), appeal docketed *sub nom. Califano* v. *Abbott*, No. 75–1643 (husband's old-age benefits); *Coffin* v. *Secretary of Health, Education and Welfare*, 400 F. Supp. 953 (DC 1975) (three-judge court), appeal docketed *sub nom. Califano* v. *Coffin*, No. 75–791 (both husband's and widower's benefits); *Jablon* v. *Secretary of Health, Education and Welfare*, 399 F. Supp. 118 (Md. 1975) (three-judge court), appeal docketed *sub nom. Califano* v. *Jablon*, No. 75–739 (husband's benefits); *Silbowitz* v. *Secretary of Health, Education and Welfare*, 397 F. Supp. 862 (SD Fla. 1975) (three-judge court), appeal docketed *sub nom. Califano* v. *Silbowitz*, No. 75–712 (husband's benefits).  See also *Kalina* v. *Railroad Retirement Bd.*, 541 F. 2d 1204 (CA6 1976) (spouse's annuity under the Railroad Retirement Act of 1974, 45 U. S. C. § 231a (c)(3)(ii) (1970 ed., Supp. V)).

her death in 1968. During that entire time she paid in full all social security taxes required by the Federal Insurance Contributions Act, 26 U. S. C. §§ 3101–3126. She was survived by her husband, Leon Goldfarb, now aged 72, a retired federal employee. Leon duly applied for widower's benefits. The application was denied with the explanation:

> "You do not qualify for a widower's benefit because you do not meet one of the requirements for such entitlement. This requirement is that you must have been receiving at least one half support from your wife when she died." [3]

The District Court declared § 402 (f)(1)(D) unconstitutional primarily on the authority of *Weinberger* v. *Wiesenfeld*, 420 U. S. 636 (1975), stating:

> "[Section 402 (f)(1)(D)] and its application to this plaintiff, 'deprive women of protection for their families which men receive as a result of their employment.' Weinberger v. Wiesenfeld, 420 U. S. 636, 645 . . . (1975). *See also* Frontiero v. Richardson, 411 U. S. 677 . . . (1973)
>
> .  .  .  .  .
>
> "Whatever may have been the ratio of contribution to family expenses of the Goldfarbs while they both

---

[3] Although Mr. Goldfarb did not pursue an administrative appeal of the denial of his application, appellant concedes that because the denial was based on his failure to meet a clear statutory requirement, further administrative review would have been futile and the initial denial was therefore "final" for purposes of the District Court's jurisdiction to review it under 42 U. S. C. § 405 (g). See *Weinberger* v. *Salfi*, 422 U. S. 749, 764–767 (1975).

In order for Mr. Goldfarb to have satisfied § 402 (f)(1)(D), his wife would have to have been earning three times what he earned. According to Brief for Appellant 25: "As a practical matter, only husbands whose wives contribute 75 percent of the family income meet [the dependency] test." That is because in order to meet the test, the wife must have provided for all of her own half of the family budget, plus half of her husband's share. For more elaborate descriptions of the dependency cal-

worked, Mrs. Goldfarb was entitled to the dignity of knowing that her social security tax would contribute to their joint welfare when the couple or one of them retired and to her husband's welfare should she predecease him. She paid taxes at the same rate as men and there is not the slightest scintilla of support for the proposition that working women are less concerned about their spouses' welfare in old age than are men." 396 F. Supp., at 308–309.

## II

The gender-based distinction drawn by § 402 (f)(1)(D)—burdening a widower but not a widow with the task of proving dependency upon the deceased spouse—presents an equal protection question indistinguishable from that decided in *Weinberger* v. *Wiesenfeld, supra.* That decision and the decision in *Frontiero* v. *Richardson,* 411 U. S. 677 (1973), plainly require affirmance of the judgment of the District Court.[4]

The statutes held unconstitutional in *Frontiero* provided increased quarters allowance and medical and dental benefits to a married male member of the uniformed Armed Services whether or not his wife in fact depended on him, while a married female service member could only

---

culation, see 20 CFR § 404.350 (1976); Social Security Claims Manual, §§ 2625, 2628. See also Brief for Appellant 25–26, and n. 14; Brief for Appellee 5 n. 7.

[4] The dissent maintains that this sentence "overstates [the] relevance" of *Wiesenfeld* and *Frontiero.* It is sufficient to answer that the principal propositions argued by appellant and in the dissent—namely, the focus on discrimination between surviving, rather than insured, spouses; the reliance on *Kahn* v. *Shevin,* 416 U. S. 351 (1974); the argument that the presumption of female dependence is empirically supportable; and the emphasis on the special deference due to classifications in the Social Security Act—were all asserted and rejected in one or both of those cases as justifications for statutes substantially similar in effect to § 402 (f)(1)(D).

receive the increased benefits if she in fact provided over one-half of her husband's support. To justify the classification, the Secretary of Defense argued: "[A]s an empirical matter, wives in our society frequently are dependent upon their husbands, while husbands rarely are dependent upon their wives. Thus, . . . Congress might reasonably have concluded that it would be both cheaper and easier simply conclusively to presume that wives of male members are financially dependent upon their husbands, while burdening female members with the task of establishing dependency in fact." 411 U. S., at 688–689. But *Frontiero* concluded that, by according such differential treatment to male and female members of the uniformed services for the sole purpose of achieving administrative convenience, the challenged statute violated the Fifth Amendment. See *Reed* v. *Reed,* 404 U. S. 71, 76 (1971); *Stanley* v. *Illinois,* 405 U. S. 645, 656–657 (1972); cf. *Schlesinger* v. *Ballard,* 419 U. S. 498, 506–507 (1975).

*Weinberger* v. *Wiesenfeld,* like the instant case, presented the question in the context of the OASDI program. There the Court held unconstitutional a provision that denied father's insurance benefits to surviving widowers with children in their care, while authorizing similar mother's benefits to similarly situated widows. Paula Wiesenfeld, the principal source of her family's support, and covered by the Act, died in childbirth, survived by the baby and her husband Stephen. Stephen applied for survivors' benefits for himself and his infant son. Benefits were allowed the baby under 42 U. S. C. § 402 (d) (1970 ed., Supp. III), but denied the father on the ground that "mother's benefits" under § 402 (g) were available only to women. The Court reversed, holding that the gender-based distinction made by § 402 (g) was "indistinguishable from that invalidated in *Frontiero,*" 420 U. S., at 642, and therefore:

"[While] the notion that men are more likely than women

to be the primary supporters of their spouses and children is not entirely without empirical support, . . . such a gender-based generalization cannot suffice to justify the denigration of the efforts of women who do work and whose earnings contribute significantly to their families' support.

"Section 402 (g) clearly operates, as did the statutes invalidated by our judgment in *Frontiero,* to deprive women of protection for their families which men receive as a result of their employment. Indeed, the classification here is in some ways more pernicious. . . . [I]n this case social security taxes were deducted from Paula's salary during the years in which she worked. Thus, she not only failed to receive for her family the same protection which a similarly situated male worker would have received, but she also was deprived of a portion of her own earnings in .order to contribute to the fund out of which benefits would be paid to others." *Id.,* at 645.

Precisely the same reasoning condemns the gender-based distinction made by § 402 (f)(1)(D) in this case. For that distinction, too, operates "to deprive women of protection for their families which men receive as a result of their employment": social security taxes were deducted from Hannah Goldfarb's salary during the quarter century she worked as a secretary, yet, in consequence of § 402 (f)(1)(D), she also "not only failed to receive for her [spouse] the same protection which a similarly situated male worker would have received [for his spouse] but she also was deprived of a portion of her own earnings in order to contribute to the fund out of which benefits would be paid to others." *Wiesenfeld* thus inescapably compels the conclusion reached by the District Court that the gender-based differentiation created by § 402 (f)(1)(D)—that results in the efforts of female workers required to pay social security taxes producing less pro-

tection for their spouses than is produced by the efforts of men—is forbidden by the Constitution, at least when supported by no more substantial justification than "archaic and overbroad" generalizations, *Schlesinger* v. *Ballard, supra,* at 508, or " 'old notions,' " *Stanton* v. *Stanton,* 421 U. S. 7, 14 (1975), such as "assumptions as to dependency," *Weinberger* v. *Wiesenfeld, supra,* at 645, that are more consistent with "the role-typing society has long imposed," *Stanton* v. *Stanton, supra,* at 15, than with contemporary reality. Thus § 402 (f)(1)(D) " '[b]y providing dissimilar treatment for men and women who are . . . similarly situated . . . violates the [Fifth Amendment].' *Reed* v. *Reed,* 404 U. S. 71, 77. . . ." *Weinberger* v. *Wiesenfeld, supra,* at 653.

## III

Appellant, however, would focus equal protection analysis, not upon the discrimination against the covered wage earning female, but rather upon whether her surviving widower was unconstitutionally discriminated against by burdening him but not a surviving widow with proof of dependency. The gist of the argument is that, analyzed from the perspective of the widower, "the denial of benefits reflected the congressional judgment that aged widowers as a class were sufficiently likely not to be dependent upon their wives that it was appropriate to deny them benefits unless they were in fact dependent." Brief for Appellant 12.

But *Weinberger* v. *Wiesenfeld* rejected the virtually identical argument when appellant's predecessor argued that the statutory classification there attacked should be regarded from the perspective of the prospective beneficiary and not from that of the covered wage earner. The Secretary in that case argued that the "pattern of legislation reflects the considered judgment of Congress that the 'probable need' for financial assistance is greater in the case of a widow, with young children to maintain, than in the case of similarly situ-

ated males." Brief for Appellant in No. 73–1892, O. T. 1974, p. 14. The Court, however, analyzed the classification from the perspective of the wage earner and concluded that the classification was unconstitutional because "benefits must be distributed according to classifications which do not without sufficient justification differentiate among covered employees solely on the basis of sex." 420 U. S., at 647. Thus, contrary to appellant's insistence, Brief for Appellant 12, *Wiesenfeld* is "dispositive here."

From its inception, the social security system has been a program of social insurance. Covered employees and their employers pay taxes into a fund administered distinct from the general federal revenues to purchase protection against the economic consequences of old age, disability, and death. But under § 402 (f)(1)(D) female insureds received less protection for their spouses solely because of their sex. Mrs. Goldfarb worked and paid social security taxes for 25 years at the same rate as her male colleagues, but because of § 402 (f)(1)(D) the insurance protection received by the males was broader than hers. Plainly then § 402 (f)(1)(D) disadvantages women contributors to the social security system as compared to similarly situated men.[5] The section then "impermissibly discriminates against a female wage earner because it provides her family less protection than it provides that of a male wage earner, even though the family needs may be identical." *Wiesenfeld, supra,* at 654–655 (POWELL, J., concur-

---

[5] The disadvantage to the woman wage earner is even more pronounced in the case of old-age benefits, to which a similarly unequal dependency requirement applies. 42 U. S. C. §§ 402 (b), (c)(1)(C) (1970 ed. and Supp. V). See n. 2, *supra.* In that situation, where the insured herself is still living, she is denied not only "the dignity of knowing [during her working career] that her social security tax would contribute to their joint welfare when the couple or one of them retired and to her husband's welfare should she predecease him," 396 F. Supp. 308, 309 (EDNY 1975) (opinion below), but also the more tangible benefit of an increase in the income of the family unit of which she remains a part.

ring). In a sense, of course, both the female wage earner and her surviving spouse are disadvantaged by operation of the statute, but this is because "Social Security is designed . . . for the protection of the *family*," 420 U. S., at 654 (POWELL, J., concurring),[6] and the section discriminates against one particular category of family—that in which the female spouse is a wage earner covered by social security.[7] Therefore decision of the equal protection challenge in this case cannot focus solely on the distinction drawn between widowers and widows but, as *Wiesenfeld* held, upon the gender-based discrimination against covered female wage earners as well.[8]

---

[6] See, *e. g.,* H. R. Rep. No. 728, 76th Cong., 1st Sess., 7 (1939), accompanying the bill that extended social security benefits for the first time beyond the covered wage earner himself. The Report emphasizes that the purpose of the amendments was "to afford more adequate protection to the *family* as a unit." (Emphasis supplied.)

[7] This is accepted by appellant and appellee. See, *e. g.,* Brief for Appellant 13 n. 2; Brief for Appellee 23; Tr. of Oral Arg. 7.

[8] In any event, gender-based discriminations against men have been invalidated when they do not "serve important governmental objectives and [are not] substantially related to the achievement of those objectives." *Craig* v. *Boren,* 429 U. S. 190, 197 (1976). Neither *Kahn* v. *Shevin,* 416 U. S. 351 (1974), nor *Schlesinger* v. *Ballard,* 419 U. S. 498 (1975), relied on by appellant, supports a contrary conclusion. The gender-based distinctions in the statutes involved in *Kahn* and *Ballard* were justified because the only discernible purpose of each was the permissible one of redressing our society's longstanding disparate treatment of women. *Craig* v. *Boren, supra,* at 198 n. 6.

But "the mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 648 (1975). That inquiry in this case demonstrates that § 402 (f) (1)(D) has no such remedial purpose. See Part IV–B, *infra.* Moreover, the classifications challenged in *Wiesenfeld* and in this case rather than advantaging women to compensate for past wrongs compounds those wrongs by penalizing women "who do work and whose earnings contribute significantly to their families' support." *Wiesenfeld, supra,* at 645.

## IV

Appellant's emphasis upon the sex-based distinction between widow and widower as recipients of benefits rather than that between covered female and covered male employees also emerges in his other arguments. These arguments have no merit.

### A

We accept as settled the proposition argued by appellant that Congress has wide latitude to create classifications that allocate noncontractual benefits under a social welfare program. *Weinberger* v. *Salfi,* 422 U. S. 749, 776–777 (1975); *Flemming* v. *Nestor,* 363 U. S. 603, 609–610 (1960). It is generally the case, as said, *id.,* at 611:

> "Particularly when we deal with a withholding of a noncontractual benefit under a social welfare program such as [Social Security], we must recognize that the Due Process Clause can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification."

See also *Weinberger* v. *Salfi, supra,* at 768–770; *Richardson* v. *Belcher,* 404 U. S. 78, 81, 84 (1971); *Dandridge* v. *Williams,* 397 U. S. 471, 485–486 (1970).

But this "does not, of course, immunize [social welfare legislation] from scrutiny under the Fifth Amendment." *Richardson* v. *Belcher, supra,* at 81. The Social Security Act is permeated with provisions that draw lines in classifying those who are to receive benefits. Congressional decisions in this regard are entitled to deference as those of the institution charged under our scheme of government with the primary responsibility for making such judgments in light of competing policies and interests. But "[t]o withstand constitutional challenge, . . . classifications by gender must serve important governmental objectives and must be substantially related to

the achievement of those objectives." *Craig* v. *Boren,* 429 U. S. 190, 197 (1976).[9] Such classifications, however, have frequently been revealed on analysis to rest only upon "old notions" and "archaic and overbroad" generalizations, *Stanton* v. *Stanton,* 421 U. S., at 14; *Schlesinger* v. *Ballard,* 419 U. S., at 508; cf. *Mathews* v. *Lucas,* 427 U. S. 495, 512–513 (1976), and so have been found to offend the prohibitions against denial of equal protection of the law. *Reed* v. *Reed,* 404 U. S. 71 (1971); *Frontiero* v. *Richardson,* 411 U. S. 677 (1973); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975); *Stanton* v. *Stanton, supra; Craig* v. *Boren, supra.* See also *Stanley* v. *Illinois,* 405 U. S. 645 (1972); *Taylor* v. *Louisiana,* 419 U. S. 522 (1975).

Therefore, *Wiesenfeld, supra,* at 646–647, expressly rejected the argument of appellant's predecessor, relying on *Flemming* v. *Nestor,* that the "noncontractual" interest of a covered employee in future social security benefits precluded any claim of denial of equal protection. Rather, *Wiesenfeld* held that the fact that the interest is "noncontractual" does not mean that "a covered employee has

---

[9] Thus, justifications that suffice for non-gender-based classifications in the social welfare area do not necessarily justify gender discriminations. For example, *Weinberger* v. *Salfi,* 422 U. S. 749 (1975), sustained a discrimination designed to weed out collusive marriages without making case-by-case determinations between marriages of less than nine months' duration and longer ones on the ground:

"While such a limitation doubtless proves in particular cases to be 'underinclusive' or 'over-inclusive' in light of its presumed purpose, it is nonetheless a widely accepted response to legitimate interests in administrative economy and certainty of coverage for those who meet its terms." *Id.,* at 776.

Yet administrative convenience and certainty of result have been found inadequate justifications for gender-based classifications. *Reed* v. *Reed,* 404 U. S. 71, 76 (1971); *Frontiero* v. *Richardson,* 411 U. S. 677, 690 (1973); *Stanley* v. *Illinois,* 405 U. S. 645, 656–657 (1972) Cf. *Mathews* v. *Lucas,* 427 U. S. 495, 509–510 (1976).

no right whatever to be treated equally with other employees as regards the benefits which flow from his or her employment," nor does it "sanction differential protection for covered employees which is solely gender based." 420 U. S., at 646. On the contrary, benefits "directly related to years worked and amount earned by a covered employee, and not to the need of the beneficiaries directly," like the employment-related benefits in *Frontiero,* "must be distributed according to classifications which do not without sufficient justification differentiate among covered employees solely on the basis of sex." 420 U. S., at 647.

## B

Appellant next argues that *Frontiero* and *Wiesenfeld* should be distinguished as involving statutes with different objectives from § 402 (f)(1)(D). Rather than merely enacting presumptions designed to save the expense and trouble of determining which spouses are really dependent, providing benefits to all widows, but only to such widowers as prove dependency, § 402 (f)(1)(D), it is argued, rationally defines different standards of eligibility because of the differing social welfare needs of widowers and widows. That is, the argument runs, Congress may reasonably have presumed that nondependent widows, who receive benefits, are needier than nondependent widowers, who do not, because of job discrimination against women (particularly older women), see *Kahn* v. *Shevin,* 416 U. S. 351, 353–354 (1974), and because they are more likely to have been more dependent on their spouses. See *Wiesenfeld,* 420 U. S., at 645; *Kahn* v. *Shevin, supra,* at 354 n. 7.[10]

But "inquiry into the actual purposes" of the discrimina-

---

[10] This argument is made for the first time in appellant's brief. The Jurisdictional Statement, p. 11, argued only the rationality of "extending to women . . . the presumption of dependency."

tion, *Wiesenfeld, supra,* at 648, proves the contrary. First, § 402 (f)(1)(D) itself is phrased in terms of *dependency,* not *need.* Congress chose to award benefits, not to widowers who could prove that they are needy, but to those who could prove that they had been dependent on their wives for more than one-half of their support. On the face of the statute, dependency, not need, is the criterion for inclusion.

Moreover, the general scheme of OASDI shows that dependence on the covered wage earner is the critical factor in determining beneficiary categories.[11] OASDI is intended to insure covered wage earners and their families against the economic and social impact on the family normally entailed by loss of the wage earner's income due to retirement, disability, or death, by providing benefits to replace the lost wages. Cf. *Jimenez* v. *Weinberger,* 417 U. S. 628, 633–634 (1974). Thus, benefits are not paid, as under other welfare programs, simply to categories of the population at large who need economic assistance, but only to members of the family of the insured wage earner.[12] Moreover, every family member other than a wife or widow is eligible for benefits only if a dependent of the covered wage earner.[13] This ac-

---

[11] Although presumed need has been a factor in determining the amounts of social security benefits, in addition to the extent of contributions made to the system, the primary determinants of the benefits received are the years worked and amount earned by the covered worker. 42 U. S. C. §§ 414, 415 (1970 ed. and Supp. V). See *Weinberger* v. *Wiesenfeld,* 420 U. S., at 647, and nn. 14, 15. In any event, need is not a requirement for inclusion in any beneficiary category, 42 U. S. C. § 402 (1970 ed. and Supp. V), and from the beginning was intended to be irrelevant to the right to receive benefits. See H. R. Rep. No. 615, 74th Cong., 1st Sess., 1 (1935).

[12] Old-age or survivors' benefits may be paid to the insured wage earner himself, 42 U. S. C. § 402 (a) (1970 ed. and Supp. V); his spouse, while he is still alive, §§ 402 (b), (c), or after his death, §§ 402 (e), (f), (g); his children, § 402 (d); and his parents, § 402 (h).

[13] Dependency is a prerequisite to qualification for parents' benefits, § 402 (h)(1)(B); children's benefits, § 402 (d)(1)(C); husbands' benefits,

cords with the system's general purpose; one who was not dependent to some degree on the covered wage earner suffers no economic loss when the wage earner leaves the work force. Thus the overall statutory scheme makes actual dependency the general basis of eligibility for OASDI benefits, and the statute, in omitting that requirement for wives and widows, reflects only a presumption that they are ordinarily dependent. At all events, nothing whatever suggests a reasoned congressional judgment that nondependent widows should receive benefits because they are more likely to be needy than nondependent widowers.

Finally, the legislative history of § 402 (f)(1)(D) refutes appellant's contention. The old-age provisions of the original Social Security Act, 49 Stat. 622, provided pension benefits only to the wage earner himself, with a lump-sum payment to his estate under certain circumstances.[14] Wives' and widows' benefits were first provided when coverage was extended to other family members in 1939. Social Security Act Amendments of 1939, 53 Stat. 1360, 1364–1366. The general purpose of the amendments was "to afford more adequate protection to the *family* as a unit." H. R. Rep. No. 728, 76th Cong., 1st Sess., 7 (1939). (Emphasis supplied.) The House Ways and Means Committee criticized the old lump-sum payment because it "make[s] payments to the estate of a deceased person regardless of whether or not he leaves dependents." *Ibid.* The Social Security Board, which had initiated the amendments in a report transmitted by the President to Congress, recommended the adop-

---

§ 402 (c)(1)(C); and widowers' benefits, §402 (f)(1)(D). (Certain children are "deemed" dependent, § 402 (d)(3). This presumption was upheld as sufficiently accurate to pass scrutiny on grounds of "administrative convenience," *Mathews* v. *Lucas,* 427 U. S. 495 (1976).)

[14] This payment essentially amounted to 3½% of the wage earner's earnings while covered, less the amount received as an old-age pension. Social Security Act § 203, 49 Stat. 623.

tion of survivors' benefits because "[t]he payment of monthly benefits to widows and orphans, who are the two chief classes of dependent survivors, would furnish more significant protection than does the payment of lump-sum benefits." H. R. Doc. No. 110, 76th Cong., 1st Sess., 7 (1939).[15]  In addition to recommending survivors' benefits, the Board suggested the extension of old-age pension benefits "for the aged dependent wife of the retired worker."[16]  *Id.,* at 6.  On the Senate floor, Senator Harrison, the principal proponent of the amendments, criticized the then-existing system of benefits because under it "no regard is had as to whether [the covered wage earner] has a dependent wife, or whether he dies leaving a child, widow, or parents."  84 Cong. Rec. 8827 (1939).  There is no indication whatever in any of the legislative history that Congress gave any attention to the specific case of nondependent widows, and found that they were in need of benefits despite their lack of dependency, in order to compensate them for disadvantages caused by sex discrimination.  There is every indication that, as *Wiesenfeld* recognized, 420 U. S., at 644, "the framers of the Act legislated on the 'then generally accepted presumption that a man is responsible for the support of his wife and children.'  D. Hoskins & L. Bixby, Women and

---

[15] See also remarks of Senator Harrison, 84 Cong. Rec. 8827 (1939). To the extent that this statement indicates that Congress found widows and orphans needier *than other dependents,* it may support a discrimination between dependent widows and dependent widowers, but it certainly demonstrates a congressional assumption that widows are dependent, rather than an intention to aid nondependent widows because of a finding that they are needier than nondependent widowers.

[16] See also Final Report of the Advisory Council on Social Security in Hearings on the Social Security Act Amendments of 1939 before the House Committee on Ways and Means, 76th Cong., 1st Sess., 30 (1939): "The inadequacy of the benefits payable during the early years of the old-age insurance program is more marked where the benefits must support not only the annuitant himself but also his wife."

Social Security: Law and Policy in Five Countries, Social Security Administration Research Report No. 42, p. 77 (1973)." [17]

Survivors' and old-age benefits were not extended to husbands and widowers until 1950. 64 Stat. 483, 485. The legislative history of this provision also demonstrates that Congress did not create the disparity between nondependent widows and widowers with a compensatory purpose. The impetus for change came from the Advisory Council on Social Security, which recommended benefits for "the aged, dependent husband . . . [and] widower." The purpose of this recommendation was "[t]o equalize the protection given to the dependents of women and men" because "[u]nder the present program, insured women lack some of the rights which insured men can acquire." Advisory Council on Social Security, Recommendations for Social Security Legislation, S. Doc. No. 208, 80th Cong., 2d Sess., 38 (1949). (Emphasis supplied in part.) It is clear from the report that the Advisory Council assumed that the provision of benefits to dependent husbands and widowers was the equivalent of the provision of benefits to wives and widows under the previous statute, and not a lesser protection deliberately made because of lesser need. Although the original bill, H. R. 6000, that became the Social Security Act Amendments of 1950 did not contain a provision for husbands' and widowers' benefits, the Senate Finance Committee added it, because "the committee believes that protection given to dependents of women and men should be made more comparable." S. Rep. No. 1669, 81st Cong., 2d Sess., 28 (1950). In 1950, as in 1939, there was simply no indication of an intention to create a differential treatment for the benefit of nondependent wives.

We conclude, therefore, that the differential treatment of nondependent widows and widowers results not, as appellant

---

[17] See also the further excerpts from and discussion of the legislative history in *Wiesenfeld,* 420 U. S., at 644 n. 13.

asserts, from a deliberate congressional intention to remedy the arguably greater needs of the former, but rather from an intention to aid the dependent spouses of deceased wage earners, coupled with a presumption that wives are usually dependent. This presents precisely the situation faced in *Frontiero* and *Wiesenfeld*. The only conceivable justification for writing the presumption of wives' dependency into the statute is the assumption, not verified by the Government in *Frontiero*, 411 U. S., at 689, or here, but based simply on "archaic and overbroad" generalizations, *Schlesinger* v. *Ballard*, 419 U. S., at 508, that it would save the Government time, money, and effort simply to pay benefits to all widows, rather than to require proof of dependency of both sexes.[18] We held in *Frontiero*, and again in *Wiesenfeld*, and therefore hold again here, that such assumptions do not suffice to justify a gender-based discrimination in the distribution of employment-related benefits.

*Affirmed.*

MR. JUSTICE STEVENS, concurring in the judgment.

Although my conclusion is the same, my appraisal of the relevant discrimination and my reasons for concluding that it is unjustified, are somewhat different from those expressed by MR. JUSTICE BRENNAN.

First, I agree with MR. JUSTICE REHNQUIST that the constitutional question raised by this plaintiff requires us to focus on his claim for benefits rather than his deceased wife's tax obligation. She had no contractual right to receive benefits or to control their payment; moreover, the payments are not a form of compensation for her services.[1] At the same salary

---

[18] In fact, the legislative history suggests that Congress proceeded casually on a "then generally accepted" stereotype and did not focus on the possible expense of determining dependence in every case.

[1] For this reason this case is not controlled by *Frontiero* v. *Richardson*, 411 U. S. 677.

level, all workers must pay the same tax, whether they are male or female, married or single, old or young, the head of a large family or a small one. The benefits which may ultimately become payable to them or to a wide variety of beneficiaries—including their families, their spouses, future spouses, and even their ex-wives—vary enormously, but such variations do not convert a uniform tax obligation into an unequal one. The discrimination against this plaintiff would be the same if the benefits were funded from general revenues. In short, I am persuaded that the relevant discrimination in this case is against surviving male spouses, rather than against deceased female wage earners.[2]

Second, I also agree with MR. JUSTICE REHNQUIST that a classification which treats certain aged widows[3] more favorably than their male counterparts is not "invidious." Such a classification does not imply that males are inferior to females, cf. *Mathews* v. *Lucas*, 427 U. S. 495, 516 (STEVENS, J., dissenting); does not condemn a large class on the basis of the misconduct of an unrepresentative few, cf. *Craig* v. *Boren*, 429 U. S. 190, 211 (STEVENS, J., concurring); and does not add to the burdens of an already disadvantaged discrete minority.

---

[2] The contrary analysis in *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 646–647, was not necessary to the decision of that case. See *id.*, at 655 (REHNQUIST, J., concurring in result).

[3] In most cases the statutory scheme for the distribution of benefits to the surviving spouses of deceased persons who paid FICA taxes on their earnings does not involve any discrimination on account of sex. Dependent spouses of both sexes are eligible; also, nondependent surviving spouses of both sexes are ineligible if their own social security retirement benefits are as large as those of their deceased spouses. There is, however, a narrow area in which the eligibility of nondependent spouses depends solely on their sex: Those who received between 50% and 75% of their support from their deceased spouses are eligible for benefits if they are female, but not if they are male. Similarly, if their earnings were not covered by the Social Security Act, as was true of the plaintiff in this case, and their earnings were less than 75% of the decedent's, they are eligible if they are female, but not if they are male. See *ante*, at 201–202, n. 1.

Cf. *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 102. It does, however, treat similarly situated persons differently solely because they are not of the same sex.

Third, MR. JUSTICE REHNQUIST correctly identifies two hypothetical justifications for this discrimination that are comparable to those the Court found acceptable in *Mathews* v. *Lucas, supra,* and *Kahn* v. *Shevin,* 416 U. S. 351. Neither the "administrative convenience" rationale of *Lucas,* nor the "policy of cushioning the financial impact of spousal loss upon the sex for which that loss imposes a disproportionately heavy burden," *Kahn* v. *Shevin, supra,* at 355, can be described as wholly irrational. Nevertheless, I find both justifications unacceptable in this case.

The administrative-convenience rationale rests on the assumption that the cost of providing benefits to nondependent widows is justified by eliminating the burden of requiring those who are dependent to establish that fact. MR. JUSTICE REHNQUIST's careful analysis of the relevant data, see *post,* at 238–239, n. 7, demonstrates that at present only about 10% of the married women in the relevant age bracket are nondependent. Omitting any requirement that widows establish dependency therefore expedites the processing of about 90% of the applications. This convenience must be regarded as significant even though procedures could certainly be developed to minimize the burden.[4]

But what is the offsetting cost that Congress imposed on the Nation in order to achieve this administrative convenience? Assuming that Congress intended only to benefit dependent spouses, and that it has authorized payments to

---

[4] Dependency in the statutory sense is a clearly defined criterion for eligibility which would have to be applied only once for each applicant. It is a requirement which several other classes of potential beneficiaries are required to meet. Moreover, the requirement would be especially easy to apply since 77% of the women over 55 do not work. (See *post,* at 238 n. 7.)

nondependent widows to save the cost of administering a dependency requirement for widows, it has paid a truly staggering price for a relatively modest administrative gain: The cost of payments to the hundreds of thousands of widows who are not within the described purpose of the statute is perhaps $750 million a year.[5] The figures for earlier years were presumably smaller, but must still have been large in relation to the possible administrative savings. It is inconceivable that Congress would have authorized such large expenditures for an administrative purpose without the benefit of any cost analysis, or indeed, without even discussing the problem. I am therefore convinced that administrative convenience was not the actual reason for the discrimination.[6]

---

[5] As of 1974, 3,546,000 women received widows' benefits. (This figure does not include "dually entitled" women who also received benefits on their own social security accounts.) Task Force on Women and Social Security, Women and Social Security: Adapting to a New Era, prepared for the Senate Special Committee on Aging, 94th Cong., 1st Sess., 84 (Comm. Print 1975). Using Mr. Justice Rehnquist's estimate, 10% of these women, or 354,600, are actually nondependent. The Secretary informs us that the average yearly widower's benefit is $2,213. Brief for Appellant 5A. Assuming that this figure also applies to widows, a total of $784,729,800 is now being paid to widows who are not actually dependent. Under similar Social Security provisions, 42 U. S. C. §§ 402 (b), (c) (1) (C) (1970 ed. and Supp. V), men but not women whose spouses have retired must prove dependency to qualify for benefits. Calculations based on the same sources and assumptions indicate that each of 270,100 nondependent wives receives $1,168, a total of $315,476,800. Thus, the cost of this administrative convenience amounts to approximately $1 billion each year.

[6] The Secretary appears to concede that this was not the justification. Brief for Appellant 22. Moreover, a 1957 amendment to the statute is inconsistent with this justification. Widow's benefits were originally not payable to a widow who had lived apart from her husband unless she had been "receiving regular contributions from him toward her support" or unless a court had ordered him to pay support. § 209 (n), 53 Stat. 1378. This provision was retained for widows in 1950 when benefits were extended to dependent widowers. § 216 (h) (2), 64 Stat. 511. The requirement that a widow who had lived separately from her husband receive at least some

It is also clear that the disparate treatment of widows and widowers is not the product of a conscious purpose to redress the "legacy of economic discrimination" against females. *Kahn* v. *Shevin, supra,* at 359 (BRENNAN, J., dissenting). The widows who benefit from the disparate treatment are those who were sufficiently successful in the job market to become nondependent on their husbands. Such a widow is the least likely to need special benefits. The widow most in need is the one who is "suddenly forced into a job market with which she is unfamiliar, and in which, because of her former economic dependency, she will have fewer skills to offer." 416 U. S., at 354. To accept the *Kahn* justification we must presume that Congress deliberately gave a special benefit to those females least likely to have been victims of the historic discrimination discussed in *Kahn*. Respect for the legislative process precludes the assumption that the statutory discrimination is the product of such irrational lawmaking.

The step-by-step evolution of this statutory scheme included a legislative decision to provide benefits for all widows and a separate decision to provide benefits for dependent widowers. Admittedly, each of these separate judgments has

support from him, makes sense if Congress was concerned with the statutory 50% test for dependency; such widows are obviously far less likely to meet that test than widows who had lived with their husbands. But Congress deleted the provision in 1957 and extended benefits to all widows, including those who lived apart from their husbands, with no requirement of support, § 216 (h), 71 Stat. 518. The 1957 amendment is affirmative evidence that Congress intended to provide benefits for all widows regardless of whether they could satisfy the statutory dependency test. It is also noteworthy that elsewhere in the statute Congress indicated its intention to create a presumption of dependency by stating that certain family members are "deemed dependent" under certain circumstances. See § 202 (d) (3), 42 U. S. C. § 402 (d) (3).

For the reasons stated in Part IV–B of MR. JUSTICE BRENNAN's opinion, the Secretary's alternative explanation of the statute as being a welfare measure intended to alleviate the poverty of elderly widows is plainly unacceptable.

a rational and benign purpose. But I consider it clear that Congress never focused its attention on the question whether to divide nondependent surviving spouses into two classes on the basis of sex.[7] The history of the statute is entirely consistent with the view that Congress simply assumed that all widows should be regarded as "dependents" in some general sense, even though they could not satisfy the statutory support test later imposed on men.[8] It is fair to infer that habit, rather than analysis or actual reflection, made it seem acceptable to equate the terms "widow" and "dependent surviving spouse." That kind of automatic reflex is far different from either a legislative decision to favor females in order to compensate for past wrongs, or a legislative decision that the administrative savings exceed the cost of extending benefits to nondependent widows.

---

[7] One indication that the 1939 Act was not the result of a focused decision concerning the needs of nondependent widows vis-à-vis widowers is the breadth of the statutory classification. Under the 1939 Act:

"[C]hildren of covered female workers were eligible for survivors' benefits only in limited circumstances . . . and no benefits whatever were made available to husbands or widowers on the basis of their wives' covered employment." *Weinberger* v. *Wiesenfeld,* 420 U. S., at 643–644.

The disqualification of a woman's surviving children if they had received any support from their father, § 202 (c) (4), 53 Stat. 1365, is particularly difficult to reconcile with the theory that the legislative motive was a conscious desire to remedy sex discrimination.

Similarly, in extending benefits to dependent widowers, Congress made no mention of any determination that nondependent widowers were less needy than nondependent widows, or that nondependent widows deserved greater benefits as a remedy for sex discrimination. See *ante,* at 216.

[8] The discriminatory feature of the statute can be said to be the fact that women are given the benefit of a broad, vague definition of "dependent" while men are held to a harsh arithmetic standard. This serves to answer the argument that appellee will receive a windfall by a judgment in his favor. Although appellee is not a dependent in the definition applied to widowers, it cannot be said with assurance that he is not a dependent in whatever broad sense Congress had in mind when it classified all widows as dependents.

I am therefore persuaded that this discrimination against a group of males is merely the accidental byproduct of a traditional way of thinking about females. I am also persuaded that a rule which effects an unequal distribution of economic benefits solely on the basis of sex is sufficiently questionable that "due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve [the] interest" put forward by the Government as its justification. See *Hampton* v. *Mow Sun Wong,* 426 U. S., at 103.[9] In my judgment, something more than accident is necessary to justify the disparate treatment of persons who have as strong a claim to equal treatment as do similarly situated surviving spouses.

But if my judgment is correct, what is to be said about *Kahn* v. *Shevin?* For that case involved a discrimination between surviving spouses which originated in 1885; a discrimination of that vintage cannot reasonably be supposed to have been motivated by a decision to repudiate the 19th century presumption that females are inferior to males.[10] It

---

[9] In the absence of evidence to the contrary, we might presume that Congress had such an interest in mind, see *Hampton* v. *Mow Sun Wong,* 426 U. S., at 103, but here that presumption is untenable. Perhaps an actual, considered legislative choice would be sufficient to allow this statute to be upheld, but that is a question I would reserve until such a choice has been made.

[10] This presumption was expressly recognized in the literature of the 19th century. It was this presumption that Mr. Bumble ridiculed when he disclaimed responsibility for his wife's misconduct. Because a part of his disclaimer is so well known, it may not be inappropriate to quote the entire passage:

" 'It was all Mrs. Bumble. She *would* do it,' urged Mr. Bumble; first looking round to ascertain that his partner had left the room.

" 'That is no excuse,' replied Mr. Brownlow. 'You were present on the occasion of the destruction of these trinkets, and, indeed, are the more guilty of the two, in the eye of the law; *for the law supposes that your wife acts under your direction.*

" 'If the law supposes that,' said Mr. Bumble, squeezing his hat emphatically in both hands, 'the law is a ass—a idiot. If that's the eye of the

seems clear, therefore, that the Court upheld the Florida statute on the basis of a hypothetical justification for the discrimination which had nothing to do with the legislature's actual motivation. On this premise, I would be required to regard *Kahn* as controlling in this case, were it not for the fact that I believe precisely the same analysis applies to *Weinberger* v. *Wiesenfeld,* 420 U. S. 636.

In *Wiesenfeld,* the Court rejected an attempt to use "mere recitation of a benign, compensatory purpose" as "an automatic shield," *id.,* at 648, for a statute which was actually based on " 'archaic and overbroad' generalization[s]," *id.,* at 643. In *Wiesenfeld,* as in this case, the victims of the statutory discrimination were widowers. They were totally excluded from eligibility for benefits available to similarly situated widows, just as in this case nondependent widowers are totally excluded from eligibility for benefits payable to nondependent widows. The exclusion in *Wiesenfeld* was apparently the accidental byproduct of the same kind of legislative process that gave rise to *Kahn* and to this case. If there is inconsistency between *Kahn* and *Wiesenfeld,* as I believe there is, it is appropriate to follow the later unanimous holding rather than the earlier, sharply divided decision. And if the cases are distinguishable, *Wiesenfeld* is closer on its facts to this case than is *Kahn.*

For these reasons, and on the authority of the *holding* in *Wiesenfeld,* I concur in the Court's judgment.

Mr. Justice Rehnquist, with whom The Chief Justice, Mr. Justice Stewart, and Mr. Justice Blackmun join, dissenting.

In light of this Court's recent decisions beginning with *Reed* v. *Reed,* 404 U. S. 71 (1971), one cannot say that

---

law, the law's a bachelor; and the worst I wish the law is, that his eye may be opened by experience—by experience.' " C. Dickens, The Adventures of Oliver Twist, c. LI (emphasis added).

there is no support in our cases for the result reached by the Court. One can, however, believe as I do that careful consideration of these cases affords more support for the opposite result than it does for that reached by the Court. Indeed, it seems to me that there are two largely separate principles which may be deduced from these cases which indicate that the Court has reached the wrong result.

The first of these principles is that cases requiring heightened levels of scrutiny for particular classifications under the Equal Protection Clause, which have originated in areas of the law outside of the field of social insurance legislation, will not be uncritically carried over into that field. This does not mean that the phrase "social insurance" is some sort of magic phrase which automatically mutes the requirements of the equal protection component of the Fifth Amendment. But it does suggest that in a legislative system which distributes benefit payments among literally millions of people there are at least two characteristics which are not found in many other types of statutes. The first is that the statutory scheme will typically have been expanded by amendment over a period of years so that it is virtually impossible to say that a particular amendment fits with mathematical nicety into a carefully conceived overall plan for payment of benefits. The second is that what in many other areas of the law will be relatively low-level considerations of "administrative convenience" will in this area of the law bear a much more vital relation to the overall legislative plan because of congressional concern for certainty in determination of entitlement and promptness in payment of benefits.

The second principle upon which I believe this legislative classification should be sustained is that set forth in our opinion in *Kahn* v. *Shevin,* 416 U. S. 351 (1974). The effect of the statutory scheme is to make it easier for widows to obtain benefits than it is for widowers, since the former

qualify automatically while the latter must show proof of need. Such a requirement in no way perpetuates or exacerbates the economic disadvantage which has led the Court to conclude that gender-based discrimination must meet a different test from other types of classifications. It is, like the property tax exemption to widows in *Kahn,* a differing treatment which " 'rest[s] upon some ground of difference having a fair and substantial relation to the object of the legislation.' " *Id.,* at 355.

I

Both *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975), and *Frontiero* v. *Richardson,* 411 U. S. 677 (1973), are undoubtedly relevant to the decision of this case, but the plurality overstates that relevance when it says that these two cases "plainly require affirmance of the judgment of the District Court." *Ante,* at 204. The disparate treatment of widows and widowers by this Act is undoubtedly a gender-based classification, but this is the beginning and not the end of the inquiry. In the case of classifications based on legitimacy, and in the case of irrebuttable presumptions, constitutional doctrine which would have invalidated the same distinctions in other contexts has been held not to require that result when they were used within comprehensive schemes for social insurance. The same result should obtain in the case of constitutional principles dealing with gender-based distinctions.

In *Levy* v. *Louisiana,* 391 U. S. 68 (1968), the Court held that a Louisiana statute which allowed legitimate but not illegitimate children to recover for the wrongful death of their mother violated the Equal Protection Clause of the Fourteenth Amendment. Another Louisiana statute was challenged on similar grounds in *Weber* v. *Aetna Cas. & Surety Co.,* 406 U. S. 164 (1972). The statute in *Weber* was defended on the ground that it did not preclude entirely

the recovery of workmen's compensation by illegitimate children, since acknowledged illegitimates were permitted to recover on the same basis as legitimate children. The Court rejected that distinction, however, and held that this statute also violated the Equal Protection Clause.

Two Terms later we held invalid under the Fifth Amendment a portion of the child's benefits provisions of the Social Security Act. The challenged provision flatly excluded one class of illegitimate children notwithstanding their actual dependence upon a disabled parent, while granting benefits to other classes of illegitimates and to legitimates on the basis of demonstrated or presumed dependence upon such a parent. *Jimenez* v. *Weinberger,* 417 U. S. 628 (1974). We relied on our earlier decision in *Weber, supra,* to reach this result.

Last Term, however, in *Mathews* v. *Lucas,* 427 U. S. 495 (1976), we upheld the portion of these same child's benefits provisions which conclusively presume dependency for all but a specified group of illegitimate children. This use of illegitimacy to define a group required to present proof of dependency was held not to deny equal protection to those singled out.

In *Stanley* v. *Illinois,* 405 U. S. 645 (1972), we held that Illinois might not under the equal protection guarantee of the Fourteenth Amendment deny a hearing on parental fitness to an unwed father when such a hearing was granted to all other parents whose custody of their children was challenged. In *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632 (1974), we likewise held invalid school board regulations requiring pregnant school teachers to take unpaid maternity leave commencing four or five months before their expected birth.

Yet, the Term following *LaFleur,* we decided *Weinberger* v. *Salfi,* 422 U. S. 749 (1975), in which a three-judge District Court had held invalid a duration-of-relationship requirement

for surviving wives in order that they might receive benefits under the Social Security Act. The District Court relied on *Stanley* and *LaFleur,* but we declined to extend those cases into the area of a complex social insurance scheme such as this Act, saying:

> "We think that the District Court's extension of the holdings of *Stanley, Vlandis,* and *LaFleur* to the eligibility requirement in issue here would turn the doctrine of those cases into a virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with the Fifth and Fourteenth Amendments to the Constitution." 422 U. S., at 772.

The Court's recent treatment of gender-based discrimination begins with *Reed* v. *Reed,* 404 U. S. 71 (1971), in which the Court invalidated a provision of the Idaho probate code which contained an across-the-board flat preference for men over women as putative administrators of the estate of a decedent. The following Term we relied on the equal protection component of the Fifth Amendment to hold invalid an Act of Congress relating to military pay which allowed a male member of the uniformed services to claim his wife as a dependent without any showing of such a fact, but which required a female member to show that her husband was in fact dependent on her before she could make such a claim. The consequences of spousal dependency were increased fringe benefits which had been provided in an effort to make the uniformed services competitive with business and industry. *Frontiero* v. *Richardson, supra,* at 679.

The next Term, however, we refused to invalidate at the behest of a male property taxpayer a provision of Florida law which allowed widows, but not widowers, an exemption from property taxation in the amount of $500. *Kahn* v. *Shevin,* 416 U. S. 351 (1974). *Weinberger* v. *Wiesenfeld,* decided one year later, relied on *Frontiero, supra,* in holding invalid a section of the Social Security Act which allowed

benefits to a surviving widow but flatly denied them to a surviving widower. The Court said:

> "Since the gender-based classification of § 402 (g) cannot be explained as an attempt to provide for the special problems of women, it is indistinguishable from the classification held invalid in *Frontiero*. Like the statutes there, '[b]y providing dissimilar treatment for men and women who are . . . similarly situated, the challenged section violates the [Due Process] Clause.' *Reed* v. *Reed*, 404 U. S. 71, 77 (1971)." 420 U. S., at 653.

Two observations about *Wiesenfeld* are pertinent. First, the provision of the Social Security Act held unconstitutional there flatly denied surviving widowers the possibility of obtaining benefits no matter what showing of need might be made. The section under attack in the instant case does not totally foreclose widowers, but simply requires from them a proof of dependency which is not required from similarly situated widows. Second, *Wiesenfeld* was decided before either *Weinberger* v. *Salfi, supra,* or *Mathews* v. *Lucas, supra.* Each of those decisions refused uncritically to extend into the field of social security law constitutional proscriptions against distinctions based on illegitimacy and irrebuttable presumptions which had originated in other areas of the law. While the holding of *Wiesenfeld* is not inconsistent with *Salfi* or *Lucas,* its reasoning is not in complete harmony with the recognition in those cases of the special characteristics of social insurance plans.

## II

Those special characteristics arise from the nature of the legislative problem which numerous sessions of Congress have had to face in defining the coverage of the Social Security Act. The program has been participatory from the outset, in the sense that benefits have not been extended to persons

without at least a close relationship to a person paying into the system during his working life. But Congress did not legislate with the idea that it was fulfilling any narrow contractual obligation owed to the program participant. On the contrary, Congress has continually increased the amounts of benefits paid, and expanded the pool of eligible recipients by singling out additional, identifiable groups having both the requisite relationship to the contributing worker and a degree of probable need which, in the legislative judgment, justifies assistance. It is not difficult to predict some traits of the system emerging from this sort of step-by-step legislative expansion.

One is that the resulting statute, like the process which produced it, extends benefits in a piecemeal fashion. There will be some individuals with needs demonstrably as great as those within a class of qualifying beneficiaries who will nonetheless be treated less favorably than that class. This is because these classes, formulated and reformulated over a period of decades, could not perfectly mirror the abstract definition of equality of need unless Congress were to burden the system with numerous individualized determinations which might frustrate the primary purposes of the Act.

Another characteristic of the Social Security statute which is predictable from the manner of its enactment, is the balance between a desire that payments correlate with degree of need and a recognition that precise correlation is unattainable given the administrative realities of the situation. No one would contend, for example, that all wives of program participants, who are over 62 and entitled to old-age or disability-insurance benefits in their own right equal to no more than one-half of their husband's primary amount, are needy. Nonetheless the administrative problems of determining actual need have led Congress to employ these and factors like them as the determinants of eligibility. 42 U. S. C. § 402 (b) (1) (1970 ed. and Supp. V). The overin-

clusiveness of such categorizations is, in many cases, not only tolerable but Solomonic. For had Congress attempted to distribute program funds in precise accordance with a purpose to alleviate need, it could very well have created a procedural leviathan consuming substantial amounts of those funds in case-by-case determinations of eligibility.

The provisions at issue in this case, relating to widows' and widowers' benefits, display all the earmarks of their origins in the oft-repeated process of legislative reconsideration and expansion of beneficiary groups. As originally enacted in 1935, the Social Security Act provided for old-age benefits only to the wage earner. 49 Stat. 623. In 1939, additional provisions were made for benefits to the wage earner's family, including wives and widows, but not including husbands and widowers. The widow's benefit was in an amount larger by one-half than that for the wife, and was available notwithstanding the widow's primary entitlement to benefits in an amount greater than permissible in the case of a wife.[1] All things considered, the 1939 amendments

---

[1] It is noteworthy that Congress did not simply state generally that immediate family members were entitled to benefits in a certain amount, but set forth several categories of benefits for family members, with unique conditions and benefit amounts attaching to each.

"Wife's Insurance Benefits" in the amount of one-half the husband's primary benefit, were to be given to a program participant's wife if she was over 65, lived with her husband (or received support from him, see 53 Stat. 1378) at the time of filing her application, and was not entitled to primary benefits of her own in an amount equal to or greater than one-half of her husband's primary amount.

"Widow's Insurance Benefits" equal to three-fourths the deceased husband's primary benefit, were made available to an unmarried widow over 65, who lived with the wage earner (or received support from him) at the time of his death, and was not entitled to primary benefits on her own equal to or greater than three-fourths of the husband's primary amount.

In addition, "Widow's Current Insurance Benefits" were made available to one failing to qualify for the widow's benefit solely on account of age, who had in her care a child qualifying for "Child's Insurance Benefits"

reflect a legislative judgment that elderly wives and widows of Social Security recipients were needy groups, and that of the two, the plight of widows was especially severe.[2] I agree with the plurality's statement that "[t]here is no indication whatever in any of the legislative history that Congress

under still another section of the amended statute. The amendments also provided for "Parent's Insurance Benefit" and "Lump-Sum Death Payments." 53 Stat. 1364–1367.

The manner in which these provisions were drafted makes clear that each involved a separate congressional judgment about the most appropriate definition and actual needs of each group.

[2] The Final Report of the Advisory Council on Social Security explained the provision as follows:

"The day of large families and of the farm economy, when aged parents were thereby assured comfort in their declining years, has passed for a large proportion of our population. This change has had particularly devastating effect on the sense of security of the aged women of our country.

"Women as a rule live longer than men. Wives are often younger than their husbands. Consequently, the probabilities are that a woman will outlive her husband. Old-age insurance benefits for the husband, supplemented during his life by an allowance payable on behalf of his wife, fall considerably short, therefore, of providing adequate old-age security."

Hearings on Social Security Act Amendments of 1939 before the House Committee on Ways and Means, 76th Cong., 1st Sess., 31–32 (1939).

Likewise, the House Committee Report described widows over 65, widows with children, orphans, and dependent parents over 65 (to whom the 1939 amendments extended benefits) as the "groups of survivors whose probable need is greatest." H. R. Rep. No. 728, 76th Cong., 1st Sess., 11 (1939). Thus, there is good reason to suppose that the 1939 enactment of a provision for widow's benefits was in response to congressional perception of substantial poverty among the large group of aged widows.

The problem persists today in proportions far greater than among the parallel group of aged widowers. In 1974, two out of three poor persons over 65 were women. Four out of five men over 65 were married, but 52% of aged women were widows. Of older women living alone, 33.4% were below the poverty line. Task Force on Women and Social Security, Women and Social Security: Adapting to a New Era, prepared for the Senate Special Committee on Aging, 94th Cong., 1st Sess., 37, 42, 68–69 (Comm. Print 1975).

gave any attention to the specific case of nondependent widows, and found that they were in need of benefits despite their lack of dependency . . . ." *Ante,* at 215. But neither is there any reason to doubt that it singled out the group of aged widows for especially favorable treatment, see n. 1, *supra,* because it saw prevalent throughout that group a characteristically high level of need.

In 1950, Congress created two new categories of old-age and survivors' insurance benefits—for husbands and widowers. With one exception, these provisions were identical to the sections dealing with wives' and widows' benefits. A husband or widower was required additionally to prove that he had been dependent upon his wife for half of his support at the time she became eligible for benefits, or, in the case of the widower, at the time of her death. 64 Stat. 483, 485. This enactment obviously reflected a congressional judgment that there were needy persons in those groups who should properly be able to receive benefits, but that their numbers were not so great as to justify automatic qualification on the basis of age and marriage to a wage-earning wife. Proof of dependence upon the wife for one-half of a husband's support was adopted as a suitable means of eliminating large numbers of men with independent incomes, while preserving an entitlement to benefits in the cases of those shown to lack substantial means of support apart from funds actually brought in by the wife.

Subsequent amendments have altered the statute somewhat—predictably in the direction of expanded coverage [3]—

---

[3] Among these changes are the lowering of the age of eligibility, the elimination, concerning spouse's and surviving spouse's benefits, of any requirement of cohabitation, and the increase in widow's and widower's benefits and in permissible primary benefits received in the beneficiary's own right from 75% to 100% of the wage earner's primary benefit. Also, additional provision has been made, under each spousal category of benefits, for a divorced spouse who was married to the wage earner for at least 20 years. This Court has recently upheld unanimously the wife's

but as relevant to this case the basic scheme has remained unchanged. The present statutory treatment of widows and widowers would seem to reflect a pair of legislative judgments about the needs of those two groups. The first is that the persons qualifying for spousal benefits are likely to have even more substantial needs after the passing of their spouse. This is indicated both by the increase in benefits to qualifying widows and widowers which now stand at 100% of the primary amount compared with the 50% paid to spouses,[4] and by the increase in the amount of primary benefits that a person may separately receive without losing entitlement to benefits under the spouse's account. While the spouse of a living wage earner loses such entitlement upon receipt of his or her own primary benefits equal to 50% of the wage earner's primary amount, a *surviving* spouse does not lose such entitlement until receiving separate benefits equal to 100%.[5]

The second legislative judgment implicit in the widow's and widower's provisions is that widows, as a practical matter, are much more likely to be without adequate means of support than are widowers. The plurality opinion makes much of establishing this point, *ante,* at 212–217, that the absence of any dependency prerequisite to the award of widow's benefits reflects a judgment, resting on "administrative convenience," that dependence among aged widows is frequent enough to justify waiving the requirement entirely. I differ not with the recognition of this administrative convenience

---

benefits section's imposition of the minimum-age requirement upon divorced wives with qualifying minor children, while waiving it in the case of undivorced wives caring for such children. *Mathews* v. *De Castro,* 429 U. S. 181 (1976).

[4] 42 U. S. C. §§ 402 (b) (2), (c) (3), (e) (2) (A), (f) (3) (A) (1970 ed. and Supp. V).

[5] 42 U. S. C. §§ 402 (b) (1) (D), (c) (1) (D), (e) (1) (D), (f) (1) (E) (1970 ed. and Supp. V).

purpose but with the conclusion that such a purpose *necessarily* invalidates the resulting classification. Our decisions dealing with social welfare legislation indicate that our inquiry must go further. For rational classifications aimed at distributing funds to beneficiaries under social insurance legislation weigh a good deal more heavily on the governmental interest side of the equal protection balance than they may in other legislative contexts. The "administrative convenience" which is afforded by such classifications in choosing the administrator of a decedent's estate, see *Reed* v. *Reed,* 404 U. S. 71 (1971), is significantly less important to the effectiveness of the legislative scheme than is the "convenience" afforded by classifications in administering an Act designed to provide benefits to millions upon millions of beneficiaries with promptness and certainty. For this reason, the plurality errs in merely dispatching this statute with an incantation of "administrative convenience." It should go further and consider the governmental interest advanced by the statutory classification in a social insurance statute such as this, in light of the claimed injury to appellee.

## III

Whatever his actual needs, Goldfarb would, of course, have no complaint if Congress had chosen to require proof of dependency by widows as well as widowers, or if it had simply refrained from making any provision whatever for benefits to surviving spouses. "A legislature may address a problem 'one step at a time,' or even 'select one phase of one field and apply a remedy there, neglecting the others.' *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 489 (1955)." *Jefferson* v. *Hackney,* 406 U. S. 535, 546 (1972); *Dandridge* v. *Williams,* 397 U. S. 471, 487 (1970). See *Geduldig* v. *Aiello,* 417 U. S. 484, 495 (1974); *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61 (1911). Any claim which he has must therefore turn upon the alleged impropriety of giving benefits to widows

without requiring them to make the same proof of dependency required of widowers.   Yet, in the context of the legislative purpose, this amounts not to exclusion but to overinclusiveness for reasons of administrative convenience which, if reasonably supported by the underlying facts, is not offensive to the Equal Protection Clause in social welfare cases.

A close analogue to this case is presented by our decision last Term in *Mathews* v. *Lucas,* 427 U. S. 495 (1976).   The plaintiffs there challenged the OASDI provisions for children's benefits, which require no proof of dependency by legitimate children or certain categories of illegitimates,[6] but which demand that other illegitimates show dependency by proof that their father lived with them or contributed to their support prior to his death.   After first stating that this classification based on legitimacy does not demand "our most exacting scrutiny," *id.,* at 506, the Court concluded that a general requirement of dependency "at the time of death is not impermissibly discriminatory in providing only for those children for whom the loss of the parent is an immediate source of the need." *Id.,* at 507.   It then upheld the waiver of the dependency proof requirement for legitimates and certain others, by the following reasoning:

> "The basis for appellees' argument is the obvious fact that each of the presumptions of dependency renders the class of benefit-recipients incrementally overinclusive, in the sense that some children within each class of

---

[6] Notwithstanding their illegitimacy, children need not demonstrate dependency if entitled to inherit from the insured parent under the state intestacy laws; if the decedent went through a marriage ceremony with the other parent which would have been valid but for a nonobvious legal defect; if the decedent had acknowledged the child in writing; or if he had been decreed to be the child's father or ordered by a court to support the child because the child was his.   42 U. S. C. §§ 402 (d), 416 (h) (1970 ed. and Supp. V).

presumptive dependents are automatically entitled to benefits under the statute although they could not in fact prove their economic dependence upon insured wage earners at the time of death. We conclude that the statutory classifications are permissible, however, because they are reasonably related to the likelihood of dependency at death.

"Congress' purpose in adopting the statutory presumptions of dependency was obviously to serve administrative convenience. While Congress was unwilling to assume that every child of a deceased insured was dependent at the time of death, by presuming dependency on the basis of relatively readily documented facts, such as legitimate birth, or existence of a support order or paternity decree, which could be relied upon to indicate the likelihood of continued actual dependency, Congress was able to avoid the burden and expense of specific case-by-case determination in the large number of cases where dependency is objectively probable. Such presumptions in aid of administrative functions, though they may approximate, rather than precisely mirror, the results that case-by-case adjudication would show, are permissible under the Fifth Amendment, so long as that lack of precise equivalence does not exceed the bounds of substantiality tolerated by the applicable level of scrutiny. See *Weinberger* v. *Salfi,* 422 U. S., 749, 772 (1975).

.        .        .        .        .

"Applying these principles, we think that the statutory classifications challenged here are justified as reasonable empirical judgments that are consistent with a design to qualify entitlement to benefits upon a child's dependency at the time of the parent's death." 427 U. S., at 508–509, 510.

The same reasoning should control in the case before us.

As in *Lucas,* Congress has here adopted a test of dependency as a reasonable surrogate for proof of actual need. In *Lucas,* legitimates and certain others were not required to satisfy that test because, in the legislative view, there was a sufficiently high rate of dependency among those groups to make the requirement of actual proof administratively counterproductive. Here the dependency test was not imposed upon widows, apparently on a similar belief that the actual rate of dependency was sufficiently high that a requirement of proof would create more administrative expense than it would save in the award of benefits.[7]

---

[7] There is substantial statistical evidence indicating that the differential treatment of widows and widowers is economically justifiable on the basis of administrative convenience. There is good reason to suppose that few enough aged widows are not, in fact, dependent at the time of their husband's death that the costs of administering the test would exceed the savings resulting from its application. Among married couples throughout our population, 43% of the wives as of 1974 are in the labor force. Bureau of the Census, A Statistical Portrait of Women in the United States 52 (Table 10–9) (Apr. 1976). Among those 43%, wives with husbands over 25 years of age contribute a median of 26.1% of the family income. *Ibid.* (Table 10–10). This is approximately equal to the 25% maximum contribution one can make and still be statutorily dependent. It thus follows that among the married population as a whole the number of dependent wives is roughly equal to the sum of those who do not work, plus one-half of those who do (since by definition, one-half contribute more and one-half contribute less than the median of 26.1%). That calculation here leads to a conclusion that about 78.5% (57%+21.5%) of *all* married women are dependent.

With regard to the group of women otherwise qualifying for widow's benefits, this figure is significantly higher. Whereas the employment rate among women between 20 and 54 is about 56%, the rate for women 55 and over is only 23%. (These figures are derived from data appearing *id.,* at 27–28 (Tables 7–1, 7–2).) Because it is dependency at the time of the working spouse's death which is relevant under the statute, the work habits of those over 55 are most relevant for determining the actual number of widows who would be excluded by a dependency test. Even if married women over 55 work as often as unmarried women in that group

## IV

Perhaps because the reasons asserted for "heightened scrutiny" of gender-based distinctions are rooted in the fact that *women* have in the past been victims of unfair treatment, see *Frontiero* v. *Richardson,* 411 U. S., at 684–688, the plurality says that the difference in treatment here is not only between a widow and a widower, but between the respective deceased spouses of the two. It concludes that wage-earning wives are deprived " 'of protection for their families which men receive as a result of their employment.' " *Ante,* at 206.

But this is a questionable tool of analysis which can be used to prove virtually anything. It might just as well have been urged in *Kahn* v. *Shevin,* 416 U. S. 351 (1974), where we upheld a Florida property tax exemption redounding to the benefit of widows but not widowers, that the real discrimination was between the deceased spouses of the respective widow and widower, who had doubtless by their contributions to the family or marital community helped make possible the acquisition of the property which was now being disparately taxed.

---

(an unlikelihood, given the greater probability that unmarried women will have no alternative means of support), this 23% figure indicates that they work just over one-half as often as the population of all married women (43% of whom work—*id.,* at 52 (Table 10–9)). This suggests that the number of married women over 55 who would satisfy the dependency test is something like 88.5%—the 77% who do not work, plus half of the remaining 23% who do. This nine-tenths correlation appears sufficiently high to justify extension of benefits to the other one-tenth for reasons of administrative convenience.

On the side of widower's benefits, the incidence of dependent husbands is certainly low enough to justify any administrative expense incurred in screening out those who are not dependent. In 1970, only 2.5% of *working* wives contributed more than the 75% of the family income which renders the husband dependent. F. Linden, Women: A Demographic, Social and Economic Presentation 34 (1973). Since only 43% of all wives work, the incidence of dependent husbands among all married couples is approximately 1% (.025×.43=.0108).

Since the claim to social security benefits is noncontractual in nature, see *Flemming* v. *Nestor,* 363 U. S. 603 (1960), the contributions of the deceased spouse cannot be regarded as creating any sort of contractual entitlement on the part of either the deceased wife or the surviving husband. Here the female wage earner has gotten the degree of protection for her family which Congress was concerned to extend to all. Neither she nor her surviving husband has any constitutional claim to more, simply because Congress has chosen, for administrative reasons, to give benefits to widows without requiring proof of dependency.

Viewed from the perspective of the recipient of benefits, the sections involved here are entirely distinguishable from those which this Court has previously struck down. In *Jimenez* v. *Weinberger,* 417 U. S. 628 (1974), the Court invalidated one aspect of the provisions for surviving children's benefits which were considered in *Mathews* v. *Lucas,* 427 U. S. 495 (1976). Those provisions allow legitimate and certain categories of illegitimate children [8] to receive benefits, whether born before or after the onset of the wage earner's disability. Other illegitimates were entitled to benefits only upon a showing of dependency *prior to the disability,* and were therefore conclusively denied benefits if born after the wage earner was disabled. Finding a legislative purpose to aid children with needs demonstrated by a dependency relationship to a disabled worker, the Court found equal protection offended by the statute's denial to some children of any opportunity to prove that they were within that class.

In *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975), the Court again invalidated OASDI provisions which denied one group any opportunity to show themselves proper beneficiaries given the apparent statutory purpose. A widow not qualifying for widow's benefits was entitled to a mother's benefit if she had in her care a minor child qualifying for a child's

---

[8] See n. 6, *supra.*

benefit, and if she did not receive more than a certain amount of primary benefits in her own right. No such provision was made, however, for a widower in a parallel position. The Court found a purpose in the statute to allow a single parent to stay home and care for the minor child, *id.*, at 648–649, and struck down the denial of benefits to fathers similarly situated. The defect of that statute was its conclusive exception of widowers from the benefited class, solely on the basis of their sex, and in contravention of the legislative purpose to allow parents with deceased spouses to provide personal parental care. There is no plausible claim to be made here that a statutory objective is being thwarted by under-inclusiveness of the classes of beneficiaries.

This case is also distinguishable from *Frontiero* v. *Richardson, supra,* in the sense that social insurance differs from compensation for work done. While there is no basis for assessing the propriety of a given allocation of funds within a social insurance program apart from an identifiable legislative purpose, a compensatory scheme may be evaluated under the principle of equal pay for equal work done. This case is therefore unlike *Frontiero,* where the Court invalidated sex discrimination among military personnel in their entitlement to increased quarters allowances on account of marriage, and in the eligibility of their spouses for dental and medical care. These compensatory fringe benefits were available to male employees as a matter of course, but were unavailable to females except on proof that their husbands depended on them for over one-half of their support. Since males got such compensatory benefits even though their wives were not so dependent, females with nondependent husbands were effectively denied equal compensation for equal effort. The same is not true here, where the benefit payments to survivors are neither contractual nor compensatory for work done, and where there is thus no comparative basis for evaluating the propriety of a given benefit apart from the legislative purpose.

## V

The very most that can be squeezed out of the facts of this case in the way of cognizable "discrimination" is a classification which favors aged widows. Quite apart from any considerations of legislative purpose and "administrative convenience" which may be advanced to support the classification, this is scarcely an invidious discrimination. Two of our recent cases have rejected efforts by men to challenge similar classifications. We have held that it is not improper for the military to formulate "up-or-out" rules taking into account sex-based differences in employment opportunities in a way working to the benefit of women, *Schlesinger* v. *Ballard,* 419 U. S. 498 (1975), or to grant solely to widows a property tax exemption in recognition of their depressed plight. *Kahn* v. *Shevin,* 416 U. S. 351 (1974). A waiver of the dependency prerequisite for benefits, in the case of this same class of aged widows, under a program explicitly aimed at the assistance of needy groups, appears to be well within the holding of the *Kahn* case, which upheld a flat $500 exemption to widows, without any consideration of need.

## VI

The classification challenged here is "overinclusive" only in the sense that widows over 62 may obtain benefits without a showing of need, whereas widowers must demonstrate need. Because this overinclusion is rationally justifiable, given available empirical data, on the basis of "administrative convenience," *Mathews* v. *Lucas, supra,* is authority for upholding it. The differentiation in no way perpetuates the economic discrimination which has been the basis for heightened scrutiny of gender-based classifications, and is, in fact, explainable as a measure to ameliorate the characteristically depressed condition of aged widows. *Kahn* v. *Shevin, supra,* is therefore also authority for upholding it. For both of these reasons, I would reverse the judgment of the District Court.