**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant,**

v.

**JOSLYN MFG. AND SUPPLY COMPANY, Defendant-Appellee.**

No. 82–1634.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 2, 1982.

Decided May 9, 1983.

Swygert, Senior Circuit Judge, dissented and filed an opinion.

Karen MacRae Smith, E.E.O.C., Washington, D.C., for plaintiff-appellant.

Michael A. Warner, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, ESCHBACH, Circuit Judge, and SWYGERT, Senior Circuit Judge.

CUMMINGS, Chief Judge.

In 1976, the Supreme Court held that Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* does not require that an employer who provides male and female employees with insurance against loss of income when they are disabled by illness or injury also provide female employees with insurance against loss of income when they are disabled by pregnancy. *General Elec-*

*tric Company v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343. Some two years later, Congress overruled that holding by enacting the Pregnancy Discrimination Act, Pub.L. No. 95–555, 92 Stat. 2076, 42 U.S.C. § 2000e(k) (1981). The issue before us on this appeal is whether in light of that Act, Title VII now requires that an employer who voluntarily insures male and female employees against the cost of hospital care for their dependents when they are injured or become sick also insure male employees against the cost of hospital care for their wives when they become pregnant. The district court, 524 F.Supp. 1141, below held that Title VII does not so require and granted summary judgment in favor of defendant. For the reasons that follow, we affirm.

## I

Defendant Joslyn Manufacturing Company ("Joslyn") insures its employees against the cost of health care for themselves, their spouses, and their unmarried children. Employees do not pay for this insurance; it is provided free of charge as part of their employment compensation. The insurance covers expenses—*viz.,* hospital room and board charges, surgical fees, doctors' fees for non-surgical hospital care—for treatment of all illnesses and injuries requiring hospitalization. It also covers expenses— *viz.,* obstetric surgical fees, hospital room and board charges, doctors' fees for non-surgical hospital care—for childbirth and all other pregnancy-related conditions requiring hospitalization.

Joslyn's insurance plan pays female employees the same benefits when they are hospitalized because of pregnancy as when they—or male employees—are hospitalized because of illness or injury. Wives of male employees, however, are treated differently. Male employees receive no reimbursement for doctors' fees when their wives are hospitalized because of pregnancy and lesser reimbursement for room and board and other miscellaneous charges than when their wives are hospitalized because of illness or injury. In addition, insurance coverage of

obstetric surgical fees and pregnancy-related hospital costs for wives of male employees begins and ends nine months later than insurance coverage of all other health costs for all insureds. Coverage for pregnant wives of male employees begins one year after the first day of employment and ends nine months after the last day of employment. Coverage of all health care costs for all other insureds, however—for hospitalization due to illness or injury and for hospitalization of pregnant female employees—begins three months after the first day of employment and ends on the last day of employment.

Plaintiff Equal Employment Opportunity Commission ("the Commission") commenced this action for injunctive relief against Joslyn, claiming that Joslyn's insurance plan violates Section 703(a) of Title VII of the Civil Rights Act as amended by the Pregnancy Discrimination Act of 1978. Section 703(a) prohibits "discriminat[ion] against any individual with respect to his compensation . . . because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e–2(a)(1), *infra,* n. 1. The Pregnancy Discrimination Act ("the Act") amends Section 701 (42 U.S.C. § 2000e) by adding subsection (k) which provides in relevant part that

[t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k) (1981).

In its complaint before the district court, the Commission charged that Joslyn's insurance plan discriminates against female employees on the basis of their sex in two respects: (1) coverage for female employees ends nine months before coverage for pregnant wives of male employees and (2) coverage for husbands and children of female

employees ends nine months before coverage for pregnant wives of male employees. The Commission also charged that the plan discriminates against male employees on the basis of their sex in two respects: (1) male employees receive lesser health insurance coverage for their wives' pregnancies than female employees receive for their husbands' illnesses and injuries and (2) coverage for pregnancies of wives of male employees begins nine months later than coverage for illnesses and injuries of husbands of female employees. The district court granted summary judgment in favor of defendant Joslyn on all four charges made by the Commission. The Commission has appealed only the judgment against it on the claims that Joslyn's insurance plan discriminates against male employees, however, so that the only question before us on this appeal is whether Title VII, as amended by the Pregnancy Discrimination Act, requires that Joslyn provide male employees the same insurance benefits when their wives are hospitalized because of pregnancy as it presently provides them when their wives are hospitalized because of injury or illness.

## II

Congress enacted the Pregnancy Discrimination Act in order to overrule the Supreme Court's decision in *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343. *Gilbert* was a suit against an employer by a class of women employees. The employer provided employees insurance against loss of income when they became disabled due to illness or injury. The women employees alleged that the insurance plan discriminated against them on the basis of their sex because it did not cover disabilities resulting from pregnancy. The Supreme Court held otherwise because women employees were insured against the same kinds of disabilities as male employees and there was no evidence that the insurance was worth more to male employees than to female employees. In fact, there was substantial evidence suggesting just the opposite. See 429 U.S. at 130–131 & n. 9, 97 S.Ct. at 405–406 & n. 9.

The sponsors and supporters of the Pregnancy Discrimination Act were unhappy with the *Gilbert* decision because they feared it would weaken the position of women in the nation's work force and jeopardize the financial security of working women and the families they support. If Title VII could be construed to allow an employer who insures employees against disabling illnesses and injuries to deny benefits to a woman employee disabled because of pregnancy, it might also be construed to allow an employer to require that women employees take unpaid leaves of absence whenever they become pregnant regardless of their ability to continue working, to reduce the wages and seniority of a woman employee who takes a leave of absence to have a child, and even to discharge a woman employee if she becomes pregnant. See 123 Cong.Rec. 29385 (1977) (statement by Sen. Williams), reprinted in Committee on Labor and Human Resources, 96th Cong., 2d Sess., Legislative History of the Pregnancy Discrimination Act of 1978 at 61–62 (hereinafter cited as "Legis.Hist."). And if employers are permitted to exclude from coverage under disability insurance plans disabilities resulting from pregnancy, many of the estimated 40 million working women in the United States—and the families they support—might be without any means of support when pregnancy disables them from working.

These fears surface again and again in statements by sponsors and supporters of the Pregnancy Discrimination Act and in reports by the congressional committees that recommended its enactment. For example, during the floor debate of the Senate bill, Senator Williams, chief sponsor of the bill and chairman of both the Senate Committee on Human Resources and the Subcommittee on Labor that reviewed it, thus characterized the purpose of the Act:

The bill before us will overcome the Court's decision [in *Gilbert*] and provide important protection for women affected by pregnancy as the testimony received by the labor subcommittee well illustrates. It is most important that this protection be provided to our Nation's working women.

It is important because a large number of working women need its protection for their financial security, and the security of their families.

\* \* \* \* \* \*

This legislation is also important because, in the long run, it will permit the 36 million working American women to assume their rightful place, and make a full contribution in our Nation's economy. Too often, sex discrimination has denied working women an opportunity to pursue a career.

\* \* \* \* \* \*

Because of their capacity to become pregnant, women have been viewed as marginal workers not deserving the full benefits of compensation and advancement granted to other workers.

\* \* \* \* \* \*

Thus, the overall effect of discrimination against women because they might become pregnant, or do become pregnant, is to relegate women in general, and pregnant women in particular, to a second-class status with regard to career advancement and continuity of employment and wages.

123 Cong.Rec. 29385 (1977), Legis.Hist. at 61–62. Senator Williams reiterated this view during floor debate of the Conference Committee Report:

Because of the Supreme Court's decision in the *Gilbert* case, this legislation is necessary to provide fundamental protection against sex discrimination for our Nation's 42 million working women. This protection will go a long way toward insuring that American women are permitted to assume their rightful place in our Nation's economy.

\* \* \* \* \* \*

In final effect, Mr. President, this legislation will restore to our working women a very basic and fundamental protection against sex discrimination. This protection is important not only to our 42 million working women but also to their families and to American industry itself. I am confident that this legislation will advance us substantially toward our goal of full participation in our economic system by American women, and that we shall all benefit in the long run from the result.

124 Cong.Rec. 36817–36818 (1978), Legis. Hist. at 201–202.

Representative Hawkins, chief sponsor of the House bill and chairman of the House Subcommittee on Employment Opportunities that considered and held hearings on it, sounded the same note when he introduced the legislation on the House floor:

The Court's decision [in *Gilbert*] will have a particularly severe impact on low-income workers who may be forced to go on leave without pay for childbirth or pregnancy-related disabilities. This loss of income may have serious repercussions for families dependent upon the wife's earnings.

In the last decade women accounted for nearly three-fifths of the increase in the civilian labor force. Approximately 85% of all these women are pregnant at some time during their working lives. Since 1950 the number of working mothers has tripled. Seventy percent of all women who work are either the sole wage earner or married to men who make under $7,000 a year. Their income is essential to support themselves and their families. The increased participation of women is due, in part, to progressive legislation which has lifted many of the barriers previously faced by women entering the labor market. We must act now to guarantee that our progressive laws do not become regressive by fact of interpretation in the courts.

\* \* \* \* \* \*

In sum, this legislation is necessary to assure that the goal set by title VII in 1964—equality of women in the work place—becomes a reality.

123 Cong.Rec. 7671, 10583 (1977), Legis. Hist. at 12, 27. Mr. Hawkins repeated this note during floor debate of the House bill:

Today, we have the opportunity to insure that genuine equality in the Ameri-

can labor force is more than an illusion and that pregnancy will no longer be the basis of unfavorable treatment of working women.

\* \* \* \* \* \*

This legislation is urgently needed in order to insure the equal treatment of men and women in the workplace, especially with respect to fringe benefit programs. Because many of the disadvantages imposed on women are predicated upon their capacity to become pregnant, genuine equality in the American labor force is no more than an illusion as long as employers remain free to make pregnancy the basis of unfavorable treatment of working women.

124 Cong.Rec. 21435 (1978), Legis.Hist. at 167–168.

Co-sponsor after co-sponsor in the House and Senate emphasized the dire consequences the *Gilbert* decision would have for working women and the families they support. When the Senate bill was introduced, Senator Brooke stated:

The Gilbert decision could have a widespread effect upon our society and our economy, for 46 percent of all women of working age are now in the labor force.

\* \* \* \* \* \*

And the effect of the Gilbert decision on these working women and their families could be devastating. Many women temporarily disabled by pregnancy will be forced to take leave without pay. In so doing, they must forfeit the income which holds their family together, which helps assure their children adequate nutrition and health care, and which helps keep their family off welfare. And faced with the dual cost of being forced to pay their medical costs plus losing their wages, many low-income women may come to feel that their only alternative is an abortion.

123 Cong.Rec. 7541 (1977), Legis.Hist. at 7. During floor debate of the Senate bill, Senator Mathias stated:

The major purpose of this legislation is to overrule the Supreme Court's decision in General Electric against Gilbert, thereby removing a major obstacle to women's efforts for equality in the job market.

123 Cong.Rec. 29663 (1977), Legis.Hist. at 133. Senator Javits, ranking minority member of the Senate Human Resources Committee, stated during floor debate of the Conference Committee Report that:

The bill represents only basic fairness for women employees. Without it, women workers would face serious obstacles to continuing their pregnancy and maintaining their jobs at the same time. Many women disabled by pregnancy would be unable to pay for medical care and hospitalization. Other women would be fired or stripped of seniority rights when they were in fact able to work. Women workers must not be made to bear such an unfair burden, especially since more than 60 percent of working women need to work to support their families.

124 Cong.Rec. 36818 (1978), Legis.Hist. at 203. Representative Sarasin explained his reasons for supporting the Conference Committee Report as follows:

This legislation really has many purposes. It is a statement of the right of American working women to equal treatment in health and disability plans, within the context of the seniority system and other employment rights. More so, however, it is a statement of the importance this country places on the family, of the fact that we must recognize the right of women to have families and to work.

The legal status of the past often forced women to choose between having children and working. For many, wanting children could not outweigh the economic realities that her income was essential. This legislation gives her the right to choose both, to be financially and legally protected before, during, and after her pregnancy.

124 Cong.Rec. 38574 (1978), Legis.Hist. at 208.

Commentators who criticized *Gilbert* and pleaded for the passage of legislation overruling it did so on precisely the same

grounds as the Congressmen who voted for the new enactment. For example, during testimony before the House Subcommittee on Employment Opportunities, the Commission itself advocated overruling *Gilbert* because of the effect it would have upon working women:

> There can be no question that the wide range of employment policies directed at pregnant women—or at all women because they might become pregnant—constitutes one of the most significant hindrances to women's equal participation in the labor market. The effect of discriminatory pregnancy policies impacts not only on the millions of working women themselves, but also on additional millions of men and children who depend on the working woman's income.
>
> \* \* \* \* \* \*
>
> Policies which disadvantage women when they become pregnant—or even because they might become pregnant—endanger the limited financial security they now have. The loss of several weeks of disability pay to a woman and her family may be the loss of the only money coming through the door. Even more frightening, a woman who becomes pregnant may face the permanent loss of her job. To many working women, these policies may mean having to make a choice between having a child or keeping a job.

*Legislation To Prohibit Sex Discrimination On The Basis Of Pregnancy: Hearing on H.R. 5055 and H.R. 6075 before the Subcommittee on Employment Opportunities of the Committee on Education and Labor,* 95th Cong., 1st Sess. 122–123 (1977) (statement of Ethel Walsh, Vice Chairman of EEOC). The Justice Department supported passage of the Act for the same reason:

> The fundamental purpose of title VII, as it prohibits discrimination on account of sex, is to make men and women equals in the market place. To the extent that women employees are required to absorb economic costs and disadvantages because of pregnancy, this goal cannot be met.

*Id.* at 172 (statement of Drew Days, Attorney General for Civil Rights, Department of Justice). See also Ginsburg (now D.C. Circuit Judge) & Ross, Pregnancy and Discrimination, N.Y. Times, Jan. 25, 1977, reprinted in 123 Cong.Rec. 7540–7541 (1977), Legis. Hist. at 6; Malamud, Sick Pay-Pregnancy Ruling Hit, N.Y. Journal of Commerce, Dec. 14, 1976, reprinted in 123 Cong.Rec. 7540 (1977), Legis.Hist. at 4–5.

It is readily apparent that, as amended, Title VII can be construed to require that employers provide male employees insurance for their wives' pregnancies only if it can be shown that Congress intended to do more than protect working women and those financially dependent upon them when it enacted the Pregnancy Discrimination Act. In the first place, working women are not disadvantaged if Title VII is not so construed. Some wives work and whether those who do receive equal treatment at the hands of their employers depends not at all upon what kind of insurance benefits their husbands' employers provide. Those wives who do not work are not hindered from doing so if their husbands' employers do not pay the medical expenses connected with their pregnancies. In fact, denying non-working wives such benefits might have the effect of encouraging them to seek employment. In the second place, the financial hardship upon families of denying male employees insurance against medical expenses for their wives' pregnancies is much less than the hardship of denying women employees insurance against loss of income. Husbands are not disabled from working when their wives become pregnant. Thus pregnancy results in no loss of family income when the wife does not work. Those wives who do work are presumably insured by their own employers against loss of income resulting from pregnancy. Moreover, the danger that the expense of bearing a child will financially crush a family is very real when the person who must pay the bills is disabled and without income but remote when the bill-payer is employed and working, or disabled and insured.

■ There are three possible arguments why the Pregnancy Discrimination Act should be construed to benefit male employ-

ees with pregnant wives as the Commission urges. First, one might argue that Congress intended to provide working men and their families the same relief from the financial cost of pregnancy and childbirth as working women and their families. The Commission does not advance this argument, and, in any event, we think it untenable. The cost of medical care for a pregnant woman is the same whether the husband or wife pays the bills. But, as the Commission concedes, Title VII does not require that an employer provide male employees the same medical expense insurance benefits for their wives' pregnancies as the employer provides female employees for their pregnancies. An employer may, without violating Title VII, insure female employees for all medical expenses connected with their pregnancies and provide no insurance coverage to male employees for their wives' pregnancies.

Second, it might be argued that Congress intended to provide working men less relief from pregnancy-related medical costs than working women. (Perhaps because there is little danger of men being denied job opportunities when their wives become pregnant.) The Commission does not make this argument either—if the act were construed as it suggests, working men might conceivably receive greater relief than working women—and we think such an argument is no more tenable than the first. There is not a speck of evidence in the legislative materials that Congress intended to benefit working men, and the most one can infer from the language of the Pregnancy Discrimination Act is that Congress did not intend not to benefit working men. Section 701(k) of the 1978 Act defines discrimination "because of sex" to include discrimination "because of * * * pregnancy, child-

birth, or related medical conditions" and does not once refer specifically to "female employees" or "pregnant employees" or "working women" (*supra,* p. 1471). Since Title VII prohibits discrimination against male employees as well as female employees, it might be supposed that had Congress wanted in 1978 to amend Title VII without affecting the rights of male employees, it would not have used language general enough to apply to claims of male employees as well as female employees. But if that general language in Section 701(k) is inserted in Section 703(a)[1] in place of the phrase it defines, then Title VII can only be read to apply to claims of female employees. See *EEOC v. Lockheed Missiles & Space Co., Inc.,* 680 F.2d 1243, 1245 (9th Cir.1982). The clause in Section 701(k) immediately following the definition provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes * * * as other persons * * * similar in their ability or inability to work." It is arguable that spouses of male employees qualify as "women affected by pregnancy" and that when employers decide whether or not to provide their employees health insurance for spouses they do so for "employment-related purposes." See *Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 667 F.2d 448, 450–451 (4th Cir.1981), affirmed on rehearing *en banc,* 682 F.2d 113 (1982), certiorari granted, —— U.S. ——, 103 S.Ct. 487, 74 L.Ed.2d 630 (1982). But the argument is too weak to persuade us that Congress intended to benefit male employees when it enacted that provision. At least some Congressmen understood this language to refer only to women employees, not spouses of male employees. 123 Cong. Rec. 29644–29645 (1977) (statements by

1. Section 703(a) provides:
   (a) It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, *sex,* or national origin; or

   (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, *because of* such individual's race, color, religion, *sex,* or national origin. (Emphasis supplied.)

Senators Hatch, Williams), Legis.Hist. at 80. More important, the provision makes no sense if it is read to apply to wives of male employees. Many spouses do not work; there is no rationale for requiring that they be treated the same as those who do if they are equally able to work.

Still a third argument one might make is that although Congress did not specifically intend to benefit working men when it enacted the 1978 Pregnancy Discrimination Act, the rationale that Congress relied upon to overrule *Gilbert* requires that employers like Joslyn provide pregnancy insurance benefits to male employees. This, in fact, is the argument the Commission stands upon in this appeal. The Commission argues that when Congress overruled *Gilbert,* it replaced with a new test the one the Supreme Court had employed in *Gilbert* for determining whether an insurance plan equally treats male and female employees. According to the Commission, this new test requires that employee insurance plans always classify pregnancy as the same kind of risk as illness or injury; medical expenses for pregnancy must be treated like all other medical expenses regardless of whether the person who incurred those expenses works. Thus, claims the Commission, Joslyn's insurance plan discriminates against male employees not because the coverage they receive for their spouses is worth less than the coverage female employees receive [2] but because "a female employee receives coverage for 100% of her spouse's disabilities, while a male employee receives comparable coverage for less than 100% of his spouse's disabilities by virtue of the maternity limitation" (Br. 7).

The Commission does not offer any reason why Congress might have adopted this new test. The Commission offers no reason why Congress might have thought that male and female employees should receive the same medical insurance coverage for an equal percentage of their spouses' disabili-

ties. The only possible rationale, however, is that Congress believed that male and female employees should be equally insured against the risk of financial loss due to medical expenses. The only difference under Joslyn's insurance plan, for example, between male employees and female employees is that because their wives' pregnancies are not insured against, male employees face a greater risk of having to pay out-of-pocket for medical expenses than do female employees. That rationale—that male and female employees should be equally insured against the risk of financial loss from medical expenses—is not, however, the rationale Congress relied upon to overrule *Gilbert* when it enacted the Pregnancy Discrimination Act. It would require what the Commission concedes that Title VII does not require, that male employees with pregnant wives receive the same insurance benefits for medical expenses as pregnant female employees. Otherwise male employees face a greater risk of loss from having to pay out-of-pocket for medical expenses than do female employees.

In *Gilbert,* the Supreme Court reasoned that Title VII required only that an employer insure women and male employees against the same kinds of disabilities, not that an employer insure women against the risk of disability to the same extent it insures men. The Court acknowledged that the risk of pregnancy made the position of women in the work force less secure than that of men (429 U.S. at 139–140 & n. 17, 97 S.Ct. at 409–410 & n. 17; see also Brief For The United States And The Equal Employment Opportunity Commission As Amici Curiae at 11–14, *Gilbert* ("The net result of the pregnancy exclusion in these plans therefore, is to subject only women to a substantial risk of total loss of income because of temporary medical disability. * * Insulating men from that risk while leaving women subject to it is necessarily discriminatory * * *.")), but reasoned that Title

---

**2.** Indeed, it is doubtful whether the Commission could make such a claim. Male employees receive the same insurance benefits when their wives are hospitalized due to illness or injury as do women employees when their husbands

are hospitalized because of illness or injury, and with a few negligible exceptions—*i.e.,* hysterectomies, vasectomies—wives of male employees and husbands of women employees are subject to the same injuries and illnesses.

VII did not require that employers compensate women employees for that risk by granting them insurance coverage that costs more than the coverage provided male employees. In the Court's view, Title VII required only that male and female employees receive the same compensation in the form of insurance benefits when they are disabled from work by the same health condition; it did not require that women employees receive greater compensation because they are susceptible to a greater number of disabling conditions and therefore suffer a greater risk of becoming disabled from work.

■ Congress overruled *Gilbert* because it thought that employers should be required to treat equally male and female employees of equal work ability, not because it thought pregnancy, illness, and injury indistinguishable health risks. All of the sponsors and supporters of the Pregnancy Discrimination Act and the congressional committees that recommended its passage disagreed with the holding in *Gilbert* because in their view Title VII required not merely that male and women employees be treated equally on the basis of their susceptibility to the same kinds of disabling injuries and illnesses, but that they be treated equally on the basis of their ability to work. Thus the Senate Report explains that

> [u]nder this bill, the treatment of pregnant women in covered employment must focus not on their condition alone but on the actual effects of that condition on their ability to work. Pregnant women who are able to work must be permitted to work on the same conditions as other employees; and when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working.

S.Rep. No. 95–331, 95th Cong., 1st Sess., 4 (1977), Legis.Hist. at 41. The House Report asserts the same principle:

> The bill would simply require that pregnant women be treated the same as other employees on the basis of their ability or inability to work.

The "same treatment" may include employer practices of transferring workers to lighter assignments, requiring employees to be examined by company doctors or other practices, so long as the requirements and benefits are administered equally for all workers in terms of their actual ability to perform work.

H.R.Rep. No. 95–948, 95th Cong., 2d Sess. 4–5 (1978), U.S.Code Cong. & Admin.News 1978, pp. 4749, 4752, Legis.Hist. at 150–151. See also Statement by Sen. Williams during floor debate, 123 Cong.Rec. 29385 (1977), Legis.Hist. at 62–63 ("The central purpose of the bill is to require that women workers be treated equally with other employees on the basis of their ability or inability to work."); Statement by Rep. Hawkins during floor debate of Conference Committee Report, 124 Cong.Rec. 38573 (1978), Legis. Hist. at 206 ("[The Pregnancy Discrimination Act] clarifies the intent of the prohibitions against sex discrimination in the [Civil Rights] act to include discrimination in employment based on pregnancy and to specifically define the standards which require that pregnant workers be treated the same as other employees on the basis of their ability or inability to work."); Statement by Rep. LaFalce during floor debate of House bill, 124 Cong.Rec. 21440 (1978), Legis.Hist. at 181 ("As was intended by the original [Civil Rights] act, all workers would be treated the same in regard to health insurance coverage, where the issue is not the gender or condition of the employee but ability to work.") Employees equally disabled from work must be afforded the same insurance benefits regardless of whether pregnancy or some illness or injury is the cause of that disability. That is the basic principle that Congress embodied in Title VII when it enacted the Pregnancy Discrimination Act in 1978. Accordingly, the Act expressly provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, * * * as other persons not so affected but similar in their ability or inability to work * * *."

■ This basic principle requires that an employer provide a female employee the same insurance benefits when she is disabled by pregnancy as it provides a male employee when he is disabled by illness or injury. It requires this even though the cost of the insurance coverage female employees will receive is greater than the cost of the insurance male employees receive. It does not, however, require that an employer provide a male employee the same insurance benefits when his wife is pregnant as it provides a female employee when her husband is sick or injured. A woman employee disabled by pregnancy is no more able to work than a male employee disabled by illness or injury. But a healthy male employee with a pregnant wife is every bit as able to work as any other healthy employee. He is as much like an equally able female employee with a healthy spouse as he is like an equally able female employee with a sick or injured spouse. If there exists some principle that can be relied upon to require that he be treated like the female employee with the sick or injured spouse and unlike the female employee with the healthy spouse or the unmarried employee, it is some principle other than that Congress embodied in Title VII when it enacted the Pregnancy Discrimination Act.

■ Measured against the Title VII principles relied upon by the Supreme Court in *Gilbert,* Joslyn's insurance plan does not discriminate against male employees on the basis of their sex. Wives of male employees are insured against the same kinds of health risks as husbands of female employees, and the Commission does not allege that the coverage male employees receive for their wives is worth less than the coverage female employees receive for their husbands. Those principles govern the Commission's claims in this appeal. *Lockheed Missiles & Space Co., Inc., supra; EEOC v. Emerson Electric Co.,* 539 F.Supp. 153 (E.D. Mo.1982). Congress did not abandon them when it overruled *Gilbert.* Indeed, it appears that every Congressman and committee that foresaw the possibility that male employees might claim a right under the Pregnancy Discrimination Act to insurance benefits for their pregnant wives understood that the principles relied upon in *Gilbert* would govern that claim. Thus the Senate Report explains that:

> Questions were raised in the committee's deliberations regarding how this bill would affect medical coverage for dependents of employees, as opposed to employees themselves. In this context it must be remembered that the basic purpose of this bill is to protect women employees, it does not alter the basic principles of Title VII law as regards sex discrimination. Rather, this legislation clarifies the definition of sex discrimination for Title VII purposes. Therefore the question in regard to dependents' benefits would be determined on the basis of existing Title VII principles.

S.Rep. No. 95–331, 95th Cong., 1st Sess. at 5–6 (1977), Legis.Hist. at 42–43. During debate on the floor of the Senate, Senator Bayh stated that the Title VII principles developed in previous case law would govern claims by male employees of discrimination on the basis of pregnancy and then expressed his personal view that those principles would require that employers like Joslyn insure male employees for their wives' pregnancies:

> There remains the question, however, of whether dependents of male employees must receive full maternity coverage if the spouses of female employees are provided complete medical coverage. While it is difficult to second-guess the courts, I feel that the history of sex discrimination cases under the 14th amendment in addition to previous interpretations of the Title VII regulations relating to the treatment of dependents will require that if companies choose to provide full coverage to the dependents of their female employees, then they must provide such complete coverage to the dependents of their male employees.

123 Cong.Rec. 29642 (1977), Legis.Hist. at 75. And during testimony before the House Subcommittee On Employment Opportunities, the Justice Department

presented its view that the Pregnancy Discrimination Act would have no effect upon the right of male employees to insurance benefits for dependents:

> The bill is to equalize opportunities for employees. It is to make certain that they are not disadvantaged in the work force by certain discriminations with respect to disabilities. I don't understand that you reach dependents and whatever coverage there might be of dependents under plans.

*Legislation To Prohibit Sex Discrimination On The Basis Of Pregnancy: Hearing on H.R. 5055 and H.R. 6075 before the Subcommittee On Employment Opportunities of the Committee On Education And Labor,* 95th Cong., 1st Sess. 187 (1977) (statement of Drew Days, Assistant Attorney General for Civil Rights, Department of Justice).

The Commission cites the above comment by Senator Bayh and one to the same effect that Senator Cranston made during the same debate, see 123 Cong.Rec. 29663 (1977), Legis.Hist. at 136, and argues that these comments demonstrate that Congress intended to require that employers provide male employees pregnancy benefits for their wives. We disagree. The opinions of both Senators were based upon their conceptions of Title VII principles in existence prior to enactment of the Pregnancy Discrimination Act. They were not based upon an understanding of how the Act would change those principles or of what the language of the Act would require of employers. That their conceptions of existing principles were wrong—Senator Bayh's understanding of the 14th Amendment is inconsistent with the Supreme Court's holding in *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256—does not establish that the Commission's proffered interpretation of the language of the Act is correct.

▇ The final argument the Commission makes is that we should adopt its present interpretation of the Pregnancy Discrimination Act because it is the federal agency responsible for administering Title VII. This argument is rejected for two reasons.

First, the Commission's present interpretation is inconsistent with a prior interpretation of the Commission. Presently, the Commission argues that the claim before us is governed by the principle it claims Congress relied upon to overrule *Gilbert,* not by those principles in existence prior to enactment of the Act. In the introduction to its interpretive guidelines published some six months after passage of the 1978 Act, however, the Commission took the opposite position:

> To the extent that a specific question is not directly answered by a reading of the Pregnancy Discrimination Act, existing principles of Title VII must be applied to resolve that question. The legislative history of the Pregnancy Discrimination Act states explicitly that the existing principles of Title VII would have to be applied to resolve the question of benefits for dependents.

EEOC's Final Interpretive Guidelines to the Pregnancy Discrimination Act of 1978, 44 Fed.Reg. 23804 (April 20, 1979). That position was consistent with an even earlier interpretation that the Commission apparently related to a Senator while the Senate bill was still in committee. See Letter from Eleanor Norton, Chairman of EEOC, to Senator Javits (June 16, 1977), Brief for Commission at 27–28.

Second, the Commission's interpretation is not supported by anything substantial in the legislative materials. Construing the Act as the Commission would like would not help Congress accomplish what it intended; construing it differently, as the district court did, would not interfere with the means Congress chose to accomplish what it intended. The Commission's interpretation does not have the force of law, *Gilbert,* 429 U.S. at 141, 97 S.Ct. at 410 ("Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations pursuant to that Title."), and its expertise at interpreting statutes is not so great that we must defer to its reading when that reading conflicts with its own prior interpretation and with applicable legislative history. See *Nashville Gas Co. v.*

*Satty,* 434 U.S. 136, 142 n. 4, 98 S.Ct. 347, 351 n. 4, 54 L.Ed.2d 356; *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124; *Association of American Railroads v. United States,* 603 F.2d 953, 962 (D.C.Cir.1979); 2 K. Davis, Administrative Law Treatise, §§ 7.8–7.12 (2nd ed. 1979).

The judgment of the district court is affirmed.

SWYGERT, Senior Circuit Judge, dissenting.

The issue in this case is whether Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (1976 & Supp. IV 1980), as amended by the Pregnancy Discrimination Act of 1978 ("PDA"), Pub.L. No. 95–955, 92 Stat. 2076 (codified at 42 U.S.C. § 2000e(k) (Supp. IV 1980)), prohibits an employer who provides disability insurance to the spouses of employees from treating pregnancy differently from other illnesses and injuries under that insurance plan. Title VII makes it "unlawful . . . for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." Section 703(a)(1), 42 U.S.C. § 2000e–2(a)(1) (1976). In 1976 the Supreme Court held that an employee disability insurance plan that carved out pregnancy for special treatment did not discriminate on the basis of sex, on the ground that pregnancy is a unique condition whose exclusion did not make the remaining areas of coverage unequal. *General Electric Co. v. Gilbert,* 429 U.S. 125, 138–40, 97 S.Ct. 401, 409–410, 50 L.Ed.2d 343 (1976). Congress rejected this interpretation when it enacted the PDA, which provides that

[t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k) (Supp. IV 1980). The majority interprets the language and legislative history of this provision to clarify the definition of sex discrimination only with regard to the pregnancies of employees, and not the spouses of employees, reasoning that Congress was motivated by a desire to prevent women who might become pregnant from being placed at a disadvantage in the job marketplace. I believe that the majority confuses legislative motive and intent. Whatever Congress's motive for legislating was, I think its intent to modify the definition of sex discrimination to include discrimination on the basis of pregnancy generally, and not just in the *Gilbert* situation, is clear. That principle, in conjunction with the preexisting Title VII principles that discrimination against men is as unlawful as discrimination against women, and that fringe benefits (which include spousal insurance) must be furnished on a sex-neutral basis, mandates my conclusion that if an employer chooses to provide disability insurance benefits to employees' spouses it must do so nondiscriminatorily, and consequently may not exclude pregnancy coverage. I therefore respectfully dissent.

I

The starting point for statutory interpretation is the language of the statute itself. The portion of the PDA with which we are concerned (quoted above) contains two clauses joined by the conjunction "and": the first is a generalized statement of the principle that sex discrimination includes pregnancy discrimination, and the second is a more specific statement that women disabled by pregnancy shall be treated the same as people disabled by other conditions. The majority argues that Title VII's prohibition of sex discrimination, when glossed by the definition of sex discrimination provided by the first clause of the PDA, in terms prohibits "discrimination against any individual . . . because of such individual's . . . [pregnancy, childbirth, or related medical condition]." 42 U.S.C. § 2000e–2(a)(1)

(1976) (with the bracketed language of the PDA, 42 U.S.C. § 2000e(k) (Supp. IV 1980), substituted for the word "sex"). *See also EEOC v. Lockheed Missiles & Space Co.,* 680 F.2d 1243, 1245 (9th Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3485 (U.S. Jan. 4, 1983) (No. 82–1006). It concludes that pregnancies of employees only, and not of employees' spouses, invoke the Act's prohibition. The majority also argues that the reference in the second clause of the PDA to pregnant women's "ability or inability to work" limits the coverage of the PDA to women employees. *See also Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 667 F.2d 448, 451–52 (4th Cir.) (Hall, J., dissenting), *aff'd on rehearing en banc per curiam,* 682 F.2d 113 (4th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 487, 74 L.Ed.2d 630 (1982). I disagree with both conclusions.

### A

The majority's interpretation of the first clause, though perhaps superficially appealing, is too facile. Because the PDA does not provide that "the term 'sex' shall be interpreted to mean 'pregnancy,'" it is inappropriate to superimpose the language of the PDA on Title VII section 703(a)(1) in the way the majority suggests. Rather, the PDA's application to the present case is more complex: Joslyn's spousal insurance plan violates Title VII because (1) it makes a distinction between male and female employees (only male employees are affected by the special treatment of pregnancy),[1] and (2) the PDA decrees the reason for the distinction discriminatory (treating pregnancy differently from other disabilities discriminates on the basis of sex). Both of these steps are necessary to the analysis of a Title VII violation: if an employer makes a distinction between employees because of their sex but the distinction is not discriminatory, there is no violation; and conversely if an employer makes a sexually discriminatory distinction that affects male and

female employees equally, there is no violation. As an example of the former (in which step (1) alone is satisfied), a modeling agency may assign only its female employees to the modeling of women's clothes, because its categorization of employees is not discriminatory even though it explicitly distinguishes on the basis of sex. *See* 1 A. Larson & L. Larson, Employment Discrimination § 10.00 (1982). As an example of the latter (in which step (2) alone is satisfied), an employer may provide disability insurance for its employees' male children only, even though it discriminates between children on the basis of their sex, because it does not distinguish male and female employees, all of whom may have daughters. This second example illustrates why a disability plan covering employees' children that excluded pregnancy benefits would not violate Title VII: although the distinction between pregnancy and other conditions is, according to the PDA, "on the basis of sex," the exclusion affects male and female employees equally. That is not true when the distinction is made on the basis of a spouse's sex (or capacity for pregnancy), as here. In that case the sex-based distinction affects male and female employees unequally, because the sex of the employee is directly and inversely correlated to the sex of the spouse. The distinction is then both sex-based and discriminatory on the basis of the employee's sex, which is all that is required to constitute a violation of Title VII.

In fact, the present case is no different than the cases that have found discrimination when fringe benefits were awarded on account of spouses of only one sex. *See Wambheim v. J.C. Penney Co.,* 642 F.2d 362, 364 (9th Cir.1981) (spousal benefits provided only if the employee was head of household, a requirement few women met, resulting in disproportionate denials of benefits to male spouses); *cf. Califano v. Goldfarb,* 430 U.S. 199, 207–09, 97 S.Ct. 1021, 1027–1028, 51 L.Ed.2d 270 (1977) (survivor's benefits paid

---

1. It does not matter if the plan does not distinguish males because of their maleness; it is sufficient to invoke Title VII that the basis for the distinction is associated with one sex or has

a disparate impact on employees of one sex. *See* 1 A. Larson & L. Larson, Employment Discrimination §§ 12.10–12.A50 (1982).

automatically to employee's widow but not to employee's widower) (decided under equal protection component of fifth amendment due process clause); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 645, 95 S.Ct. 1225, 1231, 43 L.Ed.2d 514 (1975) (survivor's benefits paid to widows but not widowers) (due process clause); *Frontiero v. Richardson,* 411 U.S. 677, 688–91, 93 S.Ct. 1764, 1771–72, 36 L.Ed.2d 583 (1973) (benefits for dependent spouses paid automatically to wives but not husbands) (due process clause). In these cases the distinctions made on the basis of the spouses' sex produced discrimination on the basis of the employees' correlative sex, just as Joslyn's disability insurance plan, which distinguishes among spouses on the basis of their capacity to become pregnant (which the PDA makes equivalent to distinctions on the basis of sex), produces discrimination on the basis of the employee's correlative sex. The language of the PDA's first clause therefore appears applicable in cases involving spousal fringe benefits.

### B

The majority argues further, however, that the PDA's second clause limits the scope of the first. I disagree with its conclusion that the reference to pregnant women's "ability or inability to work" limits the statute's coverage to women employees for two reasons. First, the thrust of the clause is to require that pregnancy be treated like other disabilities, and the concept of disability—whether it be that of an employee or not—necessarily involves the notion of inability to work. It is therefore at least arguable that the phrase defines the type of coverage and not the class of people covered. This conclusion is bolstered by the fact that the statute commands that pregnant women be treated the same as other *persons,* rather than other *employees,* similar in their ability or inability to work. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 667 F.2d at 451.

More importantly, the structure of the PDA does not purport to make the second clause act as a limitation on the first. Be-cause the two clauses are joined by the conjunction "and," they ought grammatically to have independent meaning. Construing the PDA in this way in fact makes eminent sense: the first clause states a general principle, and the second (to the extent it is limited to women employees) states the particular concern that motivated the legislation. Reading the clauses as independent would give each part of the statute meaning, but reading the second as a limitation on the first would make the first clause superfluous. It is too well known to require citation of authority that statutes should be construed so as to give each part meaning.

Indeed, even if the second clause stood alone and referred only to women employees, it could be construed to prohibit discrimination on the basis of pregnancy in the employment context generally. In *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 285–96, 96 S.Ct. 2574, 2581–86, 49 L.Ed.2d 493 (1976), the Supreme Court held that 42 U.S.C. § 1981 (1976), which provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," included a prohibition of racial discrimination against whites despite its apparent concern with the rights of nonwhites. Just as the particular language of section 1981 was construed "simply as emphasizing 'the racial character of the rights being protected,'" 427 U.S. at 287, 96 S.Ct. at 2582 (quoting *Georgia v. Rachel,* 384 U.S. 780, 791, 86 S.Ct. 1783, 1789, 16 L.Ed.2d 925 (1966)), so the PDA's concern with the rights of women employees may simply emphasize the employment-related character of the right there preserved. *See* Note, *Spousal Benefits Under the Pregnancy Discrimination Act,* 50 Geo.Wash.L.Rev. 827, 840 & n. 114 (1982). The PDA's requirement that pregnancy be treated like other disabilities "for all employment-related purposes" supports this view. The terms on which an employee receives fringe benefits, even if the benefits accrue to the employee's spouse, are unquestionably employment-related. *See Califano v. Goldfarb,* 430 U.S. at 207–08, 97 S.Ct. at 1027; *Weinber-*

ger v. Wiesenfeld, 420 U.S. at 646–47, 95 S.Ct. at 1232. *McDonald* concluded that section 1981's application was broader than its literal terms might suggest largely on the basis of its legislative history. 427 U.S. at 287–96, 96 S.Ct. at 2582–86. As I demonstrate below, the legislative history of the PDA confirms that Congress similarly understood the PDA's reach not to be limited by the particular concern that prompted its passage.

I conclude that the language and structure of the PDA prohibits the conditioning or exclusion of pregnancy benefits in otherwise comprehensive spousal disability plans, either because the first clause, which modifies the definition of sex discrimination generally, has force independent of the more specific second clause; because the second clause is not in terms limited to women employees; or because the second clause, even if so limited in terms, was intended to have broader effect.

## II

The legislative history of the PDA confirms what its language suggests. The congressional hearings, committee reports, and debates repeatedly express dissatisfaction with the rationale of the Supreme Court's decision in *Gilbert, see, e.g., Discrimination on the Basis of Pregnancy, 1977: Hearings on S. 995 Before the Subcomm. on Labor of the Senate Comm. on Human Resources,* 95th Cong., 1st Sess. 28 (1977) ("Senate Hearings") (statement of Sen. Abourezk); *id.* at 25 (statement of Sen. Kennedy); *id.* at 20–22 (statement of Sen. Mathias), *id.* at 6, 10 (statement of Sen. Bayh); H.R.Rep. No. 948, 95th Cong., 2d Sess. 2 (1978) ("House Report"), *reprinted in* 1978 U.S. Code Cong. & Ad.News 4749, 4750; S.Rep. No. 331, 95th Cong., 1st Sess. 2–3, 8 (1977) ("Senate Report"); 124 Cong.Rec. 21,440 (1978) (statement of Rep. LaFalce); *id.* at 21,436 (statement of Rep. Sarasin); 123 Cong.Rec. 29,663–64 (1977) (statement of Sen. Culver); *id.* at 29,661–62 (statement of Sen. Cranston); *id.* at 29,660 (statement of Sen. Biden); *id.* at 29,641 (statement of Sen. Bayh), and evidence an intention to reverse *Gilbert* by striking at its premise rather than its specific conclusion. This intention is not only evident from the generalized formulation of the new proposed definition, *see, e.g.,* Senate Hearings at 81 (statement of Francis T. Coleman, Attorney, on behalf of National Association of Manufacturers) (bill is broader than necessary to reverse *Gilbert*); House Report at 1, 1978 U.S.Code Cong. & Ad.News at 4750 ("H.R. 6075 will amend Title VII to clarify Congress' intent to include discrimination based on pregnancy, childbirth or related medical conditions in the prohibition against sex discrimination in employment."); Senate Report at 3–4 ("This bill was intended to make plain that ... discrimination based on pregnancy, childbirth, and related medical conditions is discrimination based on sex. Thus, the bill defines sex discrimination, as proscribed in the existing statute, to include these physiological occurrences ...."); *id.* at 9 ("This legislation ... requires that where hospital medical benefits are provided they must be provided on a nondiscriminatory basis."); 124 Cong.Rec. 21,440 (1978) (statement of Rep. LaFalce); 123 Cong.Rec. 29,642 (1977) (statement of Sen. Bayh), but also was explicitly acknowledged. The bill's drafters deliberately chose to amend the general definition of sex discrimination rather than change the result only in the situation presented in *Gilbert:*

> The prohibition against discrimination contained in S. 995 would apply to all aspects of the employment process—to hiring, reinstatement rights, seniority, and other conditions of employment covered by Title VII as well as to disability benefits. The basic purpose of S. 995, therefore, is to ensure that pregnancy related disabilities are treated the same as all other temporary disabilities. S. 995 achieves this goal by amending the definition section of Title VII so that it is clear that for purposes of Title VII, discrimination on account of pregnancy is sex discrimination. Amendment of the definition portion of Title VII appears more appropriate than an alternative, which would be to add a new, separate

prohibition to the Act. What I believe we are attempting to accomplish through this legislation is to clarify what many of us thought was the original intent of the Act.

Senate Hearings at 51–52 (statement of Drew S. Days, III, Assistant Attorney General, Civil Rights Division); *see also id.* at 35 (remarks of Sen. Williams, Chairman of Committee on Human Resources and bill's co-sponsor) ("The Supreme Court Justice writing the majority [in *Gilbert*] said, in part, 'particularly in the case of defining the term "discrimination," which Congress has nowhere in title VII defined . . .' That is the approach we are taking here in this particular area of discrimination. We are amplifying the definition and saying that to withhold where all other disabilities are covered is sex discrimination. So this bill is the clearest, most direct way of doing it and it tracks with the majority opinion in *Gilbert.*"); *Legislation to Prohibit Sex Discrimination on the Basis of Pregnancy: Hearing on H.R. 5055 and H.R. 6075 Before the Subcomm. on Employment Opportunities of the House Comm. on Education and Labor,* 95th Cong., 1st Sess. 172 (1977) ("House Hearings") (statement of Drew S. Days, III) ("To the extent that, after *Gilbert,* there are other questions remaining regarding discrimination on account of pregnancy, this legislation will aid the courts by clarifying the meaning of title VII in this area."); *id.* at 131 (statement of Drew S. Days, III) (amendment of the definition preferred over a specific prohibition). It is therefore clear that Congress was dissatisfied with the reasoning process by which the Court, focusing on inclusions, concluded that a benefit system that excludes pregnancy coverage is nondiscriminatory so long as the inclusions are equal.

Congress's intention to invalidate this rationale suggests that the PDA's first clause, which states the modified definition of sex discrimination, has force independent of the second clause, to the extent that the second clause merely prohibits the specific practice upheld in *Gilbert.* Indeed, the congressional committee reports explicitly state that the PDA was intended both to revise the definition of sex discrimination in general and to reverse *Gilbert* in particular. *See* House Report at 3, 1978 U.S.Code Cong. & Ad.News at 4751 (bill "was introduced to change the definition of sex discrimination in Title VII to the commonsense view *and* to ensure that working women are protected") (emphasis added); *id.* at 13, 1978 U.S. Code Cong. & Ad.News at 4761 (section-by-section analysis) ("This section . . . broadens the definition of sex discrimination in the act . . . . It *also* makes clear that fringe benefit programs must treat women affected by those conditions equally to other employees on the basis of their ability or inability to work . . . .") (emphasis added); Senate Report at 3 (same); *id.* at 14 (section-by-section analysis) (same).

The legislative history therefore confirms my textual reading of the second clause of the PDA as not limiting the first, and reinforces my conclusion that the revised definition applies in the present case. But the legislative history goes further: whenever the question arose whether the revised definition would be applicable to dependents' and spouses' benefit plans (although that was not Congress's primary concern), the answer given was that the new definition would apply in conjunction with existing employment discrimination principles:

[T]his legislation clarifies the definition of sex discrimination for title VII purposes. Therefore the question in regard to dependents' benefits would be determined on the basis of existing title VII principles.

. . . .

. . . Presumably because plans which provide comprehensive medical coverage for spouses of women employees but not spouses of male employees are rare, we are not aware of any title VII litigation concerning such plans. It is certainly not this committee's desire to encourage the institution of such plans. If such plans should be instituted in the future, the question would remain whether, under title VII, the affected employees were discriminated against on the basis of their sex as regards the extent of coverage for their dependents.

Senate Report at 5–6; *see also* 123 Cong. Rec. 29,663 (1977) (remarks of Sen. Cran-

ston); House Hearings at 188 (remarks of Rep. Clauss) (following a discussion of whether the bill would mandate pregnancy benefits for spouses of male employees on a par with the benefits furnished female employees in the absence of a spousal-benefit plan):

> The disability plans usually do not provide for the disability of a spouse of the worker, when she or he is disabled on the job.
>
> . . . .
>
> You are talking about equal treatment. So, in fact, if the disability plan is limited to employees, then in providing for pregnancy related disability, that too would be limited to employees.
>
> If the disability plan should be so unique that it would apply to a disability of the spouse who is not an employee, then the example given by the prior witness [concerning the furnishing of pregnancy benefits to spouses] will come into play.

In addition, two of the Senate sponsors of the bill expressed the view that the application of existing Title VII principles, with the incorporation of the new definition of discrimination, would require that pregnancy benefits be furnished to spouses on the same terms that other benefits are provided for spouses. See 123 Cong.Rec. 29,663 (1977) (remarks of Sen. Cranston) ("I would like to express for the record my own view that [a comprehensive plan covering spouses that excluded pregnancy benefits] would indeed be discriminatory and would be prohibited by the title VII sex discrimination ban."); id. at 29,642 (remarks of Sen. Bayh) ("I feel that the history of sex discrimination cases under the 14th amendment in addition to previous interpretations of Title VII regulations relating to the treatment of dependents will require that if companies choose to provide full coverage to the dependents of their female employees, then they must provide such complete coverage

to the dependents of their male employees.").

The majority argues that application of existing Title VII principles would result in upholding spousal benefit plans that are comprehensive but for disability resulting from pregnancy, on the ground that the rationale of Gilbert—that equality should be judged on the basis of inclusions rather than exclusions—survives in the spousal-benefit context. I disagree. The legislative history abundantly demonstrates that Congress sought to reverse not only the specific conclusion reached in Gilbert but also the Court's understanding of what constitutes discrimination in general. It would frustrate that intent to preserve the disfavored rationale for some select purposes. Moreover, we are not constrained to interpret Congress's reference to "existing Title VII principles" as signifying the Gilbert rationale. By referring to the need to analyze the spousal benefit issue under existing Title VII principles, Congress did not say that its new definition had no applicability; it merely acknowledged that the new definition did not by itself resolve the question. I believe Congress meant to substitute its definition of sex discrimination for the Courts within the existing Title VII analytical framework, for the new definition was created "for title VII purposes," Senate Report at 6, and was intended to "apply to all aspects of employment," House Report at 4, 1978 U.S.Code Cong. & Ad.News at 4752. That analytical framework includes the principles that fringe benefits must be awarded nondiscriminatorily, see Title VII, section 703(a)(1), 42 U.S.C. § 2000e–2(a)(1) (1976), and that men as well as women are protected from sex discrimination, see Diaz v. Pan American World Airways, Inc., 442 F.2d 385, 386 (5th Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971).[2] As I argued in Part IA above, these principles, with the incorporation of the new definition created by the statute, prohibit the use of benefit plans like Joslyn's. See also Note, Spousal Benefits Un-

---

2. One of the reasons the majority rejects the view of Senator Bayh, quoted above, that "existing Title VII principles" would forbid the treatment of pregnancy differently than other

disabilities, is that his reference to the "history of sex discrimination cases under the 14th amendment," 123 Cong.Rec. 29,642 (1977), indicates that he misunderstood those principles,

*der the Pregnancy Discrimination Act,* 50 Geo.Wash.L.Rev. 827, 837–45 (1982); Comment, *Spousal Benefits and the Pregnancy Discrimination Act of 1978,* 13 Seton Hall L.Rev. 323, 349–51 (1983).

The majority insists that because male employees were not the focus of Congress's concern when it enacted the PDA, the PDA should not be interpreted in a way that would benefit men. But I have seen no evidence that Congress wanted to override the general principle that Title VII protects men and women equally. The question is not whether Congress intended to benefit female employees to the exclusion of male employees; Congress reaffirmed the Title VII principle of *equal* treatment, and simply corrected the Supreme Court's view of what constitutes equality.

### III

Even if the language and legislative history of the PDA provided unclear guidance on this issue, which I do not believe to be the case, the court must consider the interpretational weight of the Equal Employment Opportunity Commission ("EEOC") guidelines that construe the statute. On April 20, 1979, the EEOC adopted final interpretive guidelines on sex discrimination in response to the PDA. 44 Fed.Reg. 23,804 (April 20, 1979) (codified at 29 C.F.R. § 1604.10 (1982)). The guidelines, which provide that "[d]isabilities caused or contributed to by pregnancy ... shall be treated the same as disabilities caused or contributed to by other medical conditions, under any health or disability insurance or sick leave plan available in connection with employment," 29 C.F.R. § 1604.10(b) (1982), are substantially identical to the pre–PDA guidelines, 29 C.F.R. § 1604 (1978), which Congress expressly endorsed. *See* House Report at 2, 1978 U.S.Code Cong. & Ad. News at 4750; Senate Report at 2. The new guidelines also append a series of questions and answers that apply the general standard in specific circumstances; the answers are almost invariably provided by the rule that "if pregnancy-related conditions are treated the same as other disabling conditions, the amendment is satisfied." 1 A. Larson & L. Larson, Employment Discrimination § 38.21(c), at 8–24 (1982). Included in this litany is the question presented in the present case. 29 C.F.R. § 1604 app., Questions 21 & 22 (1982).[3]

EEOC guidelines are ordinarily entitled to be accorded great weight. *See, e.g., Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971) ("The administrative interpretation

---

as *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), demonstrates. Senator Bayh's remark seems to me to indicate something quite different: that the "existing principles" refer not to the rejected rationale that *Gilbert* shares with *Geduldig* but to the broader principles of sex neutrality that Title VII and the fourteenth amendment share. *See, e.g., Califano v. Goldfarb,* 430 U.S. at 207–08, 97 S.Ct. at 1027 (spousal benefits are part of employee's compensation, which must be paid on a sex-neutral basis for equal protection purposes); *Craig v. Boren,* 429 U.S. 190, 197–99, 97 S.Ct. 451, 456–458, 50 L.Ed.2d 397 (1976) (equal protection clause of fourteenth amendment protects men as well as women).

**3.** 21. Q. Must an employer provide health insurance coverage for the medical expenses of pregnancy-related conditions of the spouses of male employees? Of the dependents of all employees?

A. Where an employer provides no coverage for dependents, the employer is not required to institute such coverage. However, if an employer's insurance program covers the medical expenses of spouses of female employees, then it must equally cover the medical expenses of spouses of male employees, including those arising from pregnancy-related conditions.

But the insurance does not have to cover the pregnancy-related conditions of non-spouse dependents as long as it excludes the pregnancy-related conditions of such non-spouse dependents of male and female employees equally.

22. Q. Must an employer provide the same level of health insurance coverage for the pregnancy-related medical conditions of the spouses of male employees as it provides for its female employees?

A. No. It is not necessary to provide the same level of coverage for the pregnancy-related medical conditions of spouses of male employees as for female employees. However, where the employer provides coverage for the medical conditions of the spouses of its employees, then the level of coverage for pregnancy-related medical conditions of the spouses of male employees must be the same as the level of coverage for all other medical

of the Act by the enforcing agency is entitled to great deference."). This principle of deference was weakened in *Gilbert* because the EEOC guidelines then in effect were not a contemporaneous interpretation of the act, contradicted the agency's earlier interpretation and conflicted with another agency's interpretation. 429 U.S. at 141–45, 97 S.Ct. at 411–412. None of those obstacles is present here. The current guidelines were contemporaneous, and the conflict that the Court in *Gilbert* saw between the EEOC's interpretation and the Wage and Hour Administrator's interpretation of the Equal Pay Act, *see id.* at 145, 97 S.Ct. at 412, was expressly removed in the PDA itself. *See* 42 U.S.C. § 2000e(k) (Supp. IV 1980). The majority sees conflict between the agency's current position that the PDA has force in the present case and its position in the introductory remarks to its guidelines that existing Title VII principles must be consulted. I do not view those positions as contradictory for the reasons stated in Part II above: the PDA does not answer the issue directly, but only within the larger Title VII framework. Finally, I also disagree with the majority's argument that the EEOC's interpretation is unsupported by legislative history for the reasons stated in Part II. Indeed, Congress's express endorsement of the prior EEOC guidelines is strong evidence that the nearly identical current guidelines are correct. I conclude that there is no reason not to give the EEOC guidelines great deference. *See* Note, *Spousal Benefits Under the Pregnancy Discrimination Act,* 50 Geo.Wash.L.Rev. 827, 837–38 (1982); Comment, *Spousal Benefits and the Pregnancy Discrimination Act of 1978,* 13 Seton Hall L.Rev. 323, 352 (1983). The guidelines therefore reinforce the conclusion I draw from the PDA's language and legislative history.

## IV

Neither Title VII nor the PDA requires an employer to provide employees fringe

benefits; they simply require that any benefits it chooses to provide be furnished on a sex-neutral basis. In enacting the PDA Congress rejected the Supreme Court's view that excluding benefits for pregnancy-related disabilities from an otherwise comprehensive disability plan is sex-neutral. It is no more neutral when the disability plan covers employees' spouses and excludes pregnancy: because the sexes of the employee and spouse are directly correlated, and the benefits paid to the spouse are part of the employee's benefits, the exclusion discriminates against male employees. I reach this conclusion by substituting the PDA definition of sex discrimination for the *Gilbert* definition, which Congress rejected, within the Title VII framework; the legislative history of the PDA reveals that this is the proper mode of analysis. My conclusion is buttressed by the EEOC guidelines, which deserve great deference. I therefore dissent.

---

conditions of the spouses of female employees. For example, if the employer covers employees for 100 percent of reasonable and customary expenses sustained for a medical condition, but only covers dependent spouses for 50 percent of reasonable and customary expenses for their medical conditions, the pregnancy-related expenses of the male employee's spouse must be covered at the 50 percent level.