Gerard E. Lynch,
concurring:
I concur fully in Judge Livingston’s thorough and detailed opinion, which accurately explains the law governing this case. As the panel opinion demonstrates, the denial of the MacNeil children’s application for survivors’ benefits follows inexorably from two clear legal rules: First, the Social Security Act defines eligible children by reference to state intestacy law. And second, New York intestacy law does not now, and never has, permitted intestate inheritance by children conceived long after the death of a parent. I write separately only to note some additional facts about the case, and to suggest that Congress may wish to take up the unique problem it poses.
First, the facts. The claimant children are the product of a combination of a moving romantic connection and modern reproductive technology. As the panel opinion describes, Sharon MacNeil married her college sweetheart not long after their graduation. Shortly thereafter, Eric MacNeil was diagnosed with a dangerous cancer. The couple were deeply committed to each other, however, and discussed their hopes for having children together. They determined to preserve Eric’s sperm, against the possibility that his cancer treatment would either fail, or, if it succeeded in saving his life, render him infertile. When Eric learned that his death was inevitable, he gave his wife permission to use the preserved sperm if she decided to have his children after his death, and took what limited steps were in his power to provide some financial support to his wife and to any children of his that she might bear, including making them the beneficiaries of a life insurance policy. Eric Mac-Neil died at twenty-four, barely a year and a half into his marriage.
Needless to say, in the wake of her young husband’s death, dealing with her grief, struggling with limited financial resources, and enduring the loss of both of her parents in the next few years, for some time Sharon MacNeil felt unable to undergo the expensive and difficult process of in vitro fertilization or to raise children as a single parent. Instead, she returned to school, obtained an advanced degree, and went to work. But her desire to have children — her late husband’s children — remained with her over years of struggle and saving. Eleven years after Eric’s death, Sharon began the process of in vitro fertilization of her eggs with Eric’s sperm and implantation of the resulting embryos. The procedure was successful: Sharon became pregnant, carried two babies to term, and gave birth to the twins whose claims are before the Court.
The MacNeils’ story, though commenced in sadness, is one of love, commitment, and determination. It is also a story of modern scientific accomplishment. Although the possibilities opened up by assisted reproductive technology are by now well established and even familiar, they would have been utterly unimaginable to the drafters of the Social Security Act in the depths of the Great Depression over 80 years ago.
Second, the suggestion. As noted, the Congress that adopted the Social Security *119 Act, and thereby provided for benefits for orphaned children, had no intentions whatever with respect to children conceived (as opposed to born) posthumously, because such conception was unimaginable at the time. In undertaking to define which children were eligible for benefits, a principal concern was drawing lines with respect to non-marital children: specifically, how could such children demonstrate their “dependence” on a deceased parent such that their entitlement to survivors’ benefits could be established? It was eminently reasonable for Congress, concerned primarily with the larger outlines of the complex social security program, to defer this question to the law of the states, which had, and still have, primary responsibility for family law, and had already developed a set of “legitimacy” laws to answer that question in the inheritance context. And the choice to rely on state intestacy laws appears to have stood the test of time; there is little evidence of controversy, difficulties, or complex litigation deriving from that decision over the years.
The rise of scientifically-assisted reproduction technologies may, however, have opened a fissure between the policies of the Social Security Act and those of intestate succession in the small category of cases like the present one. As the panel opinion discusses, New York has recently changed its inheritance laws to confer succession rights on posthumously conceived children under limited circumstances, and in particular only when such children are born within a relatively short period after the death of the intestate parent. Imposing a strict time-limit is an eminently practical decision in the inheritance context. As the Court notes, estates cannot be held open indefinitely (delaying distribution to existing heirs and incurring administrative expenses) against the possibility of the birth of additional heirs years in the future, nor is it practical to distribute an estate to existing heirs but reclaim the assets and unscramble the distributions through further litigation years later at the behest of after-born heirs. But those considerations are not relevant to the functioning of the Social Security Act.
The panel opinion notes another policy that may dovetail with those concerns, however. Citing the Supreme Court’s opinion in Astrue v. Capato, 566 U.S. 541, 132 S.Ct. 2021, 182 L.Ed.2d 887 (2012), the panel suggests that Congress may have been concerned only with protecting “dependent members of a wage earner’s family with protection against the hardship occasioned by the loss of the insured’s earnings,” id. at 2032 (internal brackets and quotation marks omitted), a hardship which the Court suggested is not experienced by “those conceived after the death of the wage earner, and thus never reliant on his support,” Panel op. at 117, citing id.
That is perhaps a reasonable view. Certainly the original drafters of the Act were concerned about children who did enjoy a parent’s financial support for some period of time (or, in the “pregnant widow” scenario, were at least conceived with that expectation), and then were deprived of that support by the parent’s untimely death. But again, Congress had no occasion at the time to think of children in the situation of the MacNeil twins.
It is perhaps unduly narrow, however, to consider that children such as the claimants here are somehow not financially burdened by the death of their biological father, simply because it occurred long before they were born. Surely, if Eric MacNeil had lived, his children would have benefitted from his earning power. And equally surely, the existing children are in a less secure financial position than they would be if their father were alive to con *120 tribute to their support. Indeed, it would be entirely reasonable for a person, anticipating that problem, to purchase insurance for the purpose of supporting his or her offspring in the event of premature death, whether or not he or she already had children or had yet developed a significant earning capacity. In the present case, Eric made the same effort: the record indicates that Eric told his wife to use the proceéds of his life insurance policy to support any children she conceived after his death. In the same spirit, it is not clear that social insurance should exclude the possibility of paying benefits on the basis of the insured’s earnings record to children who are conceived after the insured’s death.[1]
Of course, I ám iñ no position to assess whether doing so would be good or bad policy. It is the role of Congress, and not of the courts, to study the situation, assess the costs and benefits of providing such coverage, and weigh the complexities of dealing with any program to provide for posthumously conceived children (how would such children be defined, independently of state intestate succession law? how would the biological children of married parents like Eric MacNeil be distinguished from the biological offspring of an insured donor to a sperm' bank? would it matter if the children were born into a two-parent household and adopted by the surviving parent’s spouse?). Perhaps it would be reasonable to leave the law unchanged, adhering to the advantage of a clear and simple rule that provides for the originally intended class of orphaned children, rather than to attempt to create a more complicated program for the relatively few (but increasing number of) children in the situation of the present claimants, I do not have any settled view about whether it would be practical or desirable social or fiscal policy to provide a special rule for posthumously conceived' children — and if I did, It would not be my role to promote ¾ and there would be little reason for Congress to attend to it.
But I do know that there is no evidence that Congress has ever considered or addressed, the new possibilities created by assisted reproductive technology in this context, and I think, it is a mistake to pretend that anything in the original intentions of Congress in adopting the Social Security. Act tells, us what the long-deceased drafters of the Act would have thought about this case, or what a present or future Congress would conclude if it studied the question, Moreover, it is tolerably clear to me that this is an instance in which there are entirely sound reasons for states to utilize restrictive rules in the context of intestacy, which reasons diverge from the considerations relevant to the sound administration of the Social Security Act. It would therefore make sense, I think, for the Social Security Administration, and members of the relevant congressional committees and their staffs, to devote some thought to the issue.
In the present -case, however, we can only apply the law as it was written, and *121 under the law as written it is clear that Congress has not provided benefits for children in the category of the MacNeil twins. ■

. Of course, the social security system is, in fact, a "trust fund financed, in large part,-by taxes levied on the wage earners who are, the primary beneficiaries of the fund,” rather than a traditional form of insurance. See Califano v. Jobst, 434 U.S. 47, 52, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977); see also Nat’l Fed’n of Indep. Bus. v. Sebelius, 567 U.S. 519, 595, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (describing social security as a "tax-and-spend” program),. Nevertheless, the program has long been pitched to voters as comparable to insurance insofar as it extends an entitlement to benefits to people who pay info the system. See, e.g., Califano v. Goldfarb, 430 U.S. 199, 208, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977) (plurality opinion) (describing the social security system as a "program of social insurance”),